# FOUCHA *v.* LOUISIANA

No. 90–5844.   Argued November 4, 1991—Decided May 18, 1992

WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined, and an opinion with respect to Part III, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 86. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 90. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 102.

*James P. Manasseh* argued the cause for petitioner. With him on the briefs was *Martin E. Regan, Jr.*

*Pamela S. Moran* argued the cause for respondent. With her on the brief was *Harry F. Connick.**

JUSTICE WHITE delivered the opinion of the Court, except as to Part III.

When a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous. This is so whether or not he is then insane. After commitment, if the acquittee or the superintendent begins release proceedings, a review panel at the hospital makes a written report on the patient's mental condition and whether he can be released without danger to himself or others. If release is recommended, the court must hold a hearing to determine dangerousness; the acquittee has the burden of proving that he is not dangerous. If found to be dangerous, the acquittee may be returned to the mental institution whether or not he is then mentally ill. Petitioner contends that this scheme denies him due process and equal protection because it allows a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness.

I

Petitioner Terry Foucha was charged by Louisiana authorities with aggravated burglary and illegal discharge of a firearm. Two medical doctors were appointed to conduct a pretrial examination of Foucha. The doctors initially reported, and the trial court initially found, that Foucha lacked mental capacity to proceed, App. 8–9, but four months later the trial court found Foucha competent to stand trial, *id.*, at 4–5. The doctors reported that Foucha was unable to distin-

*Briefs of *amici curiae* urging reversal were filed for the American Orthopsychiatric Association et al. by *James W. Ellis* and *Barbara E. Bergman;* and for the American Psychiatric Association by *Joel I. Klein.*

guish right from wrong and was insane at the time of the offense.[1]  On October 12, 1984, the trial court ruled that Foucha was not guilty by reason of insanity, finding that he "is unable to appreciate the usual, natural and probable consequences of his acts; that he is unable to distinguish right from wrong; that he is a menace to himself and others; and that he was insane at the time of the commission of the above crimes and that he is presently insane." *Id.*, at 6.  He was committed to the East Feliciana Forensic Facility until such time as doctors recommend that he be released, and until further order of the court.  In 1988, the superintendent of Feliciana recommended that Foucha be discharged or released.  A three-member panel was convened at the institution to determine Foucha's current condition and whether he could be released or placed on probation without being a danger to others or himself.  On March 21, 1988, the panel reported that there had been no evidence of mental illness since admission and recommended that Foucha be conditionally discharged.[2]  The trial judge appointed a two-member sanity commission made up of the same two doctors who had conducted the pretrial examination.  Their written report stated that Foucha "is presently in remission from mental illness [but] [w]e cannot certify that he would not constitute

---

[1] Louisiana law provides: "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility."  La. Rev. Stat. Ann. § 14:14 (West 1986).  JUSTICE KENNEDY disregards the fact that the State makes no claim that Foucha was criminally responsible or that it is entitled to punish Foucha as a criminal.

[2] The panel unanimously recommended that petitioner be conditionally discharged with recommendations that he (1) be placed on probation; (2) remain free from intoxicating and mind-altering substances; (3) attend a substance abuse clinic on a regular basis; (4) submit to regular and random urine drug screening; and (5) be actively employed or seeking employment.  App. 10–11.

Although the panel recited that it was charged with determining dangerousness, its report did not expressly make a finding in that regard.

a menace to himself or others if released." *Id.*, at 12. One of the doctors testified at a hearing that upon commitment Foucha probably suffered from a drug induced psychosis but that he had recovered from that temporary condition; that he evidenced no signs of psychosis or neurosis and was in "good shape" mentally; that he had, however, an antisocial personality, a condition that is not a mental disease and that is untreatable. The doctor also testified that Foucha had been involved in several altercations at Feliciana and that he, the doctor, would not "feel comfortable in certifying that [Foucha] would not be a danger to himself or to other people." *Id.*, at 18.

After it was stipulated that the other doctor, if he were present, would give essentially the same testimony, the court ruled that Foucha was dangerous to himself and others and ordered him returned to the mental institution. The Court of Appeal refused supervisory writs, and the State Supreme Court affirmed, holding that Foucha had not carried the burden placed upon him by statute to prove that he was not dangerous, that our decision in *Jones* v. *United States*, 463 U. S. 354 (1983), did not require Foucha's release, and that neither the Due Process Clause nor the Equal Protection Clause was violated by the statutory provision permitting confinement of an insanity acquittee based on dangerousness alone.

Because the case presents an important issue and was decided by the court below in a manner arguably at odds with prior decisions of this Court, we granted certiorari. 499 U. S. 946 (1991).

## II

*Addington* v. *Texas*, 441 U. S. 418 (1979), held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his

own welfare and protection of others. Proof beyond a reasonable doubt was not required, but proof by preponderance of the evidence fell short of satisfying due process.[3]

When a person charged with having committed a crime is found not guilty by reason of insanity, however, a State may commit that person without satisfying the *Addington* burden with respect to mental illness and dangerousness. *Jones* v. *United States, supra.* Such a verdict, we observed in *Jones,* "establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness," *id.,* at 363, an illness that the defendant adequately proved in this context by a preponderance of the evidence. From these two facts, it could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed.[4]

---

[3] JUSTICE THOMAS in dissent complains that Foucha should not be released based on psychiatric opinion that he is not mentally ill because such opinion is not sufficiently precise—because psychiatry is not an exact science and psychiatrists widely disagree on what constitutes a mental illness. That may be true, but such opinion is reliable enough to permit the courts to base civil commitments on clear and convincing medical evidence that a person is mentally ill and dangerous and to base release decisions on qualified testimony that the person is no longer mentally ill or dangerous. It is also reliable enough for the State not to punish a person who by a preponderance of the evidence is found to have been insane at the time he committed a criminal act, to say nothing of not trying a person who is at the time found incompetent to understand the proceedings. And more to the point, medical predictions of dangerousness seem to be reliable enough for JUSTICE THOMAS to permit the State to continue to hold Foucha in a mental institution, even where the psychiatrist would say no more than that he would hesitate to certify that Foucha would not be dangerous to himself or others.

[4] JUSTICE KENNEDY's assertion that we overrule the holding of *Jones* described in the above paragraph is fanciful at best. As that paragraph plainly shows, we do not question and fully accept that insanity acquittees may be initially held without complying with the procedures applicable to civil committees. As is evident from the ensuing paragraph of the text, we are also true to the further holding of *Jones* that both JUSTICE THOMAS

We held, however, that "[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous," *id.*, at 368; *i. e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer. We relied on *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), which held as a matter of due process that it was unconstitutional for a State to continue to confine a harmless, mentally ill person. Even if the initial commitment was permissible, "it could not constitutionally continue after that basis no longer existed." *Id.*, at 575. In the summary of our holdings in our opinion we stated that "the Constitution permits the Government, on the basis of the insanity judg-

---

and JUSTICE KENNEDY reject: that the period of time during which an insanity acquittee may be held in a mental institution is not measured by the length of a sentence that might have been imposed had he been convicted; rather, the acquittee may be held until he is either not mentally ill or not dangerous. Both Justices would permit the indefinite detention of the acquittee, although the State concedes that he is not mentally ill and although the doctors at the mental institution recommend his release, for no reason other than that a psychiatrist hesitates to certify that the acquittee would not be dangerous to himself or others.

JUSTICE KENNEDY asserts that we should not entertain the proposition that a verdict of not guilty by reason of insanity differs from a conviction. *Post*, at 94. *Jones*, however, involved a case where the accused had been "found, beyond a reasonable doubt, to have committed a criminal act." 463 U. S., at 364. We did not find this sufficient to negate any difference between a conviction and an insanity acquittal. Rather, we observed that a person convicted of crime may of course be punished. But "[d]ifferent considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished." *Id.*, at 369.

JUSTICE KENNEDY observes that proof beyond reasonable doubt of the commission of a criminal act permits a State to incarcerate and hold the offender on any reasonable basis. There is no doubt that the States have wide discretion in determining punishment for convicted offenders, but the Eighth Amendment ensures that discretion is not unlimited. The Justice cites no authority, but surely would have if it existed, for the proposition that a defendant convicted of a crime and sentenced to a term of years may nevertheless be held indefinitely because of the likelihood that he will commit other crimes.

ment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones*, 463 U. S., at 368, 370.[5] The court below was in error in characterizing the above language from *Jones* as merely an interpretation of the pertinent statutory law in the District of Columbia and as having no constitutional significance. In this case, Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. *O'Connor, supra*, at 574–575.

The State, however, seeks to perpetuate Foucha's confinement at Feliciana on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the court found rendered him a danger to himself or others. There are at least three difficulties with this position. First, even if his continued confinement were constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness. In *Vitek* v. *Jones*, 445 U. S. 480 (1980), we held that a convicted felon serving his sentence has a liberty interest, not extinguished by his confinement as a criminal, in not being transferred to a mental institution and hence classified as men-

---

[5] JUSTICE THOMAS, dissenting, suggests that there was no issue of the standards for release before us in *Jones*. The issue in that case, however, was whether an insanity acquittee "must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted," 463 U. S., at 356; and in the course of deciding that issue in the negative, we said that the detainee could be held until he was no longer mentally ill or no longer dangerous, regardless of how long a prison sentence might have been. We noted in footnote 11 that Jones had not sought a release based on nonillness or nondangerousness, but as indicated in the text, we twice announced the outside limits on the detention of insanity acquittees. The Justice would "wish" away this aspect of *Jones*, but that case merely reflected the essence of our prior decisions.

tally ill without appropriate procedures to prove that he was mentally ill. "The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement." *Id.*, at 492. Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed. *Jones, supra*, at 368; *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972). Here, according to the testimony given at the hearing in the trial court, Foucha is not suffering from a mental disease or illness. If he is to be held, he should not be held as a mentally ill person. See *Jones, supra*, at 368; *Jackson, supra*, at 738. Cf. *United States* v. *Salerno*, 481 U. S. 739, 747–748 (1987); *Schall* v. *Martin*, 467 U. S. 253, 270 (1984).

Second, if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement. *Jackson* v. *Indiana, supra*, indicates as much. There, a person under criminal charges was found incompetent to stand trial and was committed until he regained his sanity. It was later determined that nothing could be done to cure the detainee, who was a deaf mute. The state courts refused to order his release. We reversed, holding that the State was entitled to hold a person for being incompetent to stand trial only long enough to determine if he could be cured and become competent. If he was to be held longer, the State was required to afford the protections constitutionally required in a civil commitment proceeding. We noted, relying on *Baxstrom* v. *Herold*, 383 U. S. 107 (1966), that a convicted criminal who allegedly was mentally ill was entitled to release at the end of his term unless the State committed him in a civil proceeding. " '[T]here is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.' " *Jackson* v. *Indiana, supra*, at 724, quoting *Baxstrom, supra*, at 111–112.

Third, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon* v. *Burch*, 494 U. S. 113, 125 (1990). See also *Salerno, supra,* at 746; *Daniels* v. *Williams*, 474 U. S. 327, 331 (1986). Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. *Youngberg* v. *Romeo*, 457 U. S. 307, 316 (1982). "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones, supra,* at 361 (internal quotation marks omitted). We have always been careful not to "minimize the importance and fundamental nature" of the individual's right to liberty. *Salerno, supra,* at 750.

A State, pursuant to its police power, may of course imprison convicted criminals for the purposes of deterrence and retribution. But there are constitutional limitations on the conduct that a State may criminalize. See, *e. g., Brandenburg* v. *Ohio*, 395 U. S. 444 (1969); *Robinson* v. *California*, 370 U. S. 660 (1962). Here, the State has no such punitive interest. As Foucha was not convicted, he may not be punished. *Jones, supra,* at 369. Here, Louisiana has by reason of his acquittal exempted Foucha from criminal responsibility as La. Rev. Stat. Ann. § 14:14 (West 1986) requires. See n. 1, *supra.*

The State may also confine a mentally ill person if it shows "by clear and convincing evidence that the individual is mentally ill and dangerous," *Jones*, 463 U. S., at 362. Here, the State has not carried that burden; indeed, the State does not claim that Foucha is now mentally ill.

We have also held that in certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited confinement and it is on these cases, particularly *United States* v. *Salerno, supra,* that the State relies in this case.

*Salerno,* unlike this case, involved pretrial detention. We observed in *Salerno* that the "government's interest in preventing crime by arrestees is both legitimate and compelling," *id.,* at 749, and that the statute involved there was a constitutional implementation of that interest. The statute carefully limited the circumstances under which detention could be sought to those involving the most serious of crimes (crimes of violence, offenses punishable by life imprisonment or death, serious drug offenses, or certain repeat offenders), *id.,* at 747, and was narrowly focused on a particularly acute problem in which the government interests are overwhelming, *id.,* at 750. In addition to first demonstrating probable cause, the Government was required, in a "full-blown adversary hearing," to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person, *i. e.,* that the "arrestee presents an identified and articulable threat to an individual or the community." *Id.,* at 751. Furthermore, the duration of confinement under the Bail Reform Act of 1984 (Act) was strictly limited. The arrestee was entitled to a prompt detention hearing and the maximum length of pretrial detention was limited by the "stringent time limitations of the Speedy Trial Act." *Id.,* at 747. If the arrestee were convicted, he would be confined as a criminal proved guilty; if he were acquitted, he would go free. Moreover, the Act required that detainees be housed, to the extent practicable, in a facility separate from persons awaiting or serving sentences or awaiting appeal. *Id.,* at 747–748.

*Salerno* does not save Louisiana's detention of insanity acquittees who are no longer mentally ill. Unlike the sharply focused scheme at issue in *Salerno,* the Louisiana scheme of confinement is not carefully limited. Under the state statute, Foucha is not now entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community. Indeed, the State need prove nothing to justify continued de-

tention, for the statute places the burden on the detainee to prove that he is not dangerous. At the hearing which ended with Foucha's recommittal, no doctor or any other person testified positively that in his opinion Foucha would be a danger to the community, let alone gave the basis for such an opinion. There was only a description of Foucha's behavior at Feliciana and his antisocial personality, along with a refusal to certify that he would not be dangerous. When directly asked whether Foucha would be dangerous, Dr. Ritter said only, "I don't think I would feel comfortable in certifying that he would not be a danger to himself or to other people." App. 18. This, under the Louisiana statute, was enough to defeat Foucha's interest in physical liberty. It is not enough to defeat Foucha's liberty interest under the Constitution in being freed from indefinite confinement in a mental facility.

Furthermore, if Foucha committed criminal acts while at Feliciana, such as assault, the State does not explain why its interest would not be vindicated by the ordinary criminal processes involving charge and conviction, the use of enhanced sentences for recidivists, and other permissible ways of dealing with patterns of criminal conduct. These are the normal means of dealing with persistent criminal conduct. Had they been employed against Foucha when he assaulted other inmates, there is little doubt that if then sane he could have been convicted and incarcerated in the usual way.

It was emphasized in *Salerno* that the detention we found constitutionally permissible was strictly limited in duration. 481 U. S., at 747; see also *Schall*, 467 U. S., at 269. Here, in contrast, the State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any con-

victed criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States* v. *Salerno, supra*, at 755. The narrowly focused pretrial detention of arrestees permitted by the Bail Reform Act was found to be one of those carefully limited exceptions permitted by the Due Process Clause. We decline to take a similar view of a law like Louisiana's, which permits the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others.[6]

---

[6] JUSTICE THOMAS' dissent firmly embraces the view that the State may indefinitely hold an insanity acquittee who is found by a court to have been cured of his mental illness and who is unable to prove that he would not be dangerous. This would be so even though, as in this case, the court's finding of dangerousness is based solely on the detainee's antisocial personality that apparently has caused him to engage in altercations from time to time. JUSTICE THOMAS, however, does not challenge the holding of our cases that a convicted criminal may not be held as a mentally ill person without following the requirements for civil commitment, which would not permit further detention based on dangerousness alone. Yet it is surely strange to release sane but very likely dangerous persons who have committed a crime knowing precisely what they were doing but continue to hold indefinitely an insanity detainee who committed a criminal act at a time when, as found by a court, he did not know right from wrong. JUSTICE THOMAS' rationale for continuing to hold the insanity acquittee would surely justify treating the convicted felon in the same way, and if put to it, it appears that he would permit it. But as indicated in the text, this is not consistent with our present system of justice.

JUSTICE THOMAS relies heavily on the American Law Institute's (ALI) Model Penal Code and Commentary. However, his reliance on the Model Code is misplaced and his quotation from the Commentary is importantly incomplete. JUSTICE THOMAS argues that the Louisiana statute follows

84

## III

It should be apparent from what has been said earlier in this opinion that the Louisiana statute also discriminates

---

"the current provisions" of the Model Penal Code, but he fails to mention that § 4.08 is "current" only in the sense that the Model Code has not been amended since its approval in 1962, and therefore fails to incorporate or reflect substantial developments in the relevant decisional law during the intervening three decades. Thus, although this is nowhere noted in the dissent, the Explanatory Notes expressly concede that related and similarly "current" provisions of Article 4 are unconstitutional. See, *e. g.*, ALI, Model Penal Code § 4.06(2), Explanatory Note (1985) (noting that § 4.06(2), permitting indefinite commitment of a mentally incompetent defendant without the finding required for civil commitment, is unconstitutional in light of *Jackson* v. *Indiana*, 406 U. S. 715 (1972), and other decisions of this Court). Nor indeed does JUSTICE THOMAS advert to the 1985 Explanatory Note to § 4.08 itself, even though that note directly questions the constitutionality of the provision that he so heavily relies on; it acknowledges, as JUSTICE THOMAS does not, that "it is now questionable whether a state may use the single criterion of dangerousness to grant discharge if it employs a different standard for release of persons civilly committed." JUSTICE THOMAS also recites from the Commentary regarding § 4.08. However, the introductory passage that JUSTICE THOMAS quotes prefaces a more important passage that he omits. After explaining the rationale for the questionable provision, the Commentary states: "Constitutional doubts . . . exist about the criterion of dangerousness. If a person committed civilly must be released when he is no longer suffering mental illness, it is questionable whether a person acquitted on grounds of mental disease or defect excluding responsibility can be kept in custody solely on the ground that he continues to be dangerous." *Id.*, § 4.08, Comment 3, p. 260. Thus, while JUSTICE THOMAS argues that the Louisiana statute is not a relic of a bygone age, his principal support for this assertion is a 30-year-old provision of the Model Penal Code whose constitutionality has since been openly questioned by the ALI reporters themselves.

Similarly unpersuasive is JUSTICE THOMAS' claim regarding the number of States that allow confinement based on dangerousness alone. First, this assertion carries with it an obvious but unacknowledged corollary—the vast majority of States do not allow confinement based on dangerousness alone. Second, JUSTICE THOMAS' description of these state statutes also is importantly incomplete. Even as he argues that a scheme of confinement based on dangerousness alone is not a relic of a bygone age, JUSTICE THOMAS neglects to mention that two of the statutes he relies

against Foucha in violation of the Equal Protection Clause of the Fourteenth Amendment. *Jones* established that insanity acquittees may be treated differently in some respects from those persons subject to civil commitment, but Foucha, who is not now thought to be insane, can no longer be so classified. The State nonetheless insists on holding him indefinitely because he at one time committed a criminal act and does not now prove he is not dangerous. Louisiana law, however, does not provide for similar confinement for other classes of persons who have committed criminal acts and who cannot later prove they would not be dangerous. Criminals who have completed their prison terms, or are about to do so, are an obvious and large category of such persons. Many of them will likely suffer from the same sort of personality disorder that Foucha exhibits. However, state law does not allow for their continuing confinement based merely on dangerousness. Instead, the State controls the behavior of these similarly situated citizens by relying on other means, such as punishment, deterrence, and supervised release.

---

on have been amended, as JUSTICE O'CONNOR notes. Nor does JUSTICE THOMAS acknowledge that at least two of the other statutes he lists as permitting confinement based on dangerousness alone have been given a contrary construction by highest state courts, which have found that the interpretation for which JUSTICE THOMAS cites them would be impermissible. See *State* v. *Fields*, 77 N. J. 282, 390 A. 2d 574 (1978); *In re Lewis*, 403 A. 2d 1115, 1121 (Del. 1979), quoting *Mills* v. *State*, 256 A. 2d 752, 757, n. 4 (Del. 1969) ("By necessary implication, the danger referred to must be construed to relate to mental illness for the reason that dangerousness without mental illness could not be a valid basis for indeterminate confinement in the State hospital"). See also ALI, Model Penal Code, *supra*, at 260 (although provisions may on their face allow for confinement based on dangerousness alone, in virtually all actual cases the questions of dangerousness and continued mental disease are likely to be closely linked). As the widespread rejection of the standard for confinement that JUSTICE THOMAS and JUSTICE KENNEDY argue for demonstrates, States are able to protect both the safety of the public and the rights of the accused without challenging foundational principles of American criminal justice and constitutional law.

Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward, for such discrimination against insanity acquittees who are no longer mentally ill.

Furthermore, in civil commitment proceedings the State must establish the grounds of insanity and dangerousness permitting confinement by clear and convincing evidence. *Addington*, 441 U. S., at 425–433. Similarly, the State must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original confinement no longer exists. See *Jackson*, 406 U. S., at 724; *Baxstrom*, 383 U. S., at 111–112. Cf. *Humphrey* v. *Cady*, 405 U. S. 504, 510–511 (1972). However, the State now claims that it may continue to confine Foucha, who is not now considered to be mentally ill, solely because he is deemed dangerous, but without assuming the burden of proving even this ground for confinement by clear and convincing evidence. The court below gave no convincing reason why the procedural safeguards against unwarranted confinement which are guaranteed to insane persons and those who have been convicted may be denied to a sane acquittee, and the State has done no better in this Court.

For the foregoing reasons the judgment of the Louisiana Supreme Court is reversed.

*So ordered.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

Louisiana asserts that it may indefinitely confine Terry Foucha in a mental facility because, although not mentally ill, he might be dangerous to himself or to others if released. For the reasons given in Part II of the Court's opinion, this contention should be rejected. I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits in-

definite confinement of sane insanity acquittees in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws that provide for detention of insanity acquittees, or on statutes that provide for punishment of persons who commit crimes while mentally ill.

I do not understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health. Under Louisiana law, defendants who carry the burden of proving insanity by a preponderance of the evidence will "escape punishment," but this affirmative defense becomes relevant only after the prosecution establishes beyond a reasonable doubt that the defendant committed criminal acts with the required level of criminal intent. *State* v. *Marmillion*, 339 So. 2d 788, 796 (La. 1976). Although insanity acquittees may not be incarcerated as criminals or penalized for asserting the insanity defense, see *Jones* v. *United States*, 463 U. S. 354, 368–369, and n. 18 (1983), this finding of criminal conduct sets them apart from ordinary citizens.

We noted in *Jones* that a judicial determination of criminal conduct provides "concrete evidence" of dangerousness. *Id.*, at 364. By contrast, " '[t]he only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . .' " *Id.*, at 365, n. 13 (quoting *Greenwood* v. *United States*, 350 U. S. 366, 375 (1956)). Given this uncertainty, "courts should pay particular deference to reasonable legislative judgments" about the relationship between dangerous behavior and mental illness. *Jones*, *supra*, at 365, n. 13. Louisiana evidently has determined that the inference of dangerousness drawn from a verdict of not guilty by reason of insanity continues even after a clinical finding of sanity, and that judgment merits judicial deference.

It might therefore be permissible for Louisiana to confine an insanity acquittee who has regained sanity if, unlike the situation in this case, the nature and duration of detention

were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness. See *United States* v. *Salerno,* 481 U. S. 739, 747–751 (1987); *Schall* v. *Martin,* 467 U. S. 253, 264–271 (1984); *Jackson* v. *Indiana,* 406 U. S. 715, 738 (1972). Although the dissenters apparently disagree, see *post,* at 100 (opinion of KENNEDY, J.); *post,* at 125 (opinion of THOMAS, J.), I think it clear that acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case the necessary connection between the nature and purposes of confinement would be absent. See *Vitek* v. *Jones,* 445 U. S. 480, 491–494 (1980) (discussing infringements upon liberty unique to commitment to a mental hospital); *Jones, supra,* at 384–385 (Brennan, J., dissenting) (same). Nor would it be permissible to treat all acquittees alike, without regard for their particular crimes. For example, the strong interest in liberty of a person acquitted by reason of insanity but later found sane might well outweigh the governmental interest in detention where the only evidence of dangerousness is that the acquittee committed a nonviolent or relatively minor crime. Cf. *Salerno, supra,* at 750 (interest in pretrial detention is "overwhelming" where only individuals arrested for "a specific category of extremely serious offenses" are detained and "Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest"). Equal protection principles may set additional limits on the confinement of sane but dangerous acquittees. Although I think it unnecessary to reach equal protection issues on the facts before us, the permissibility of holding an acquittee who is not mentally ill longer than a person convicted of the same crimes could be imprisoned is open to serious question.

The second point to be made about the Court's holding is that it places no new restriction on the States' freedom to determine whether, and to what extent, mental illness should excuse criminal behavior. The Court does not indi-

cate that States must make the insanity defense available. See Idaho Code § 18–207(a) (1987) (mental condition not a defense to criminal charges); Mont. Code Ann. § 46–14–102 (1991) (evidence of mental illness admissible to prove absence of state of mind that is an element of the offense). It likewise casts no doubt on laws providing for prison terms after verdicts of "guilty but mentally ill." See, e. g., Del. Code Ann., Tit. 11, § 408(b) (1987); Ill. Rev. Stat., ch. 38, ¶ 1005–2–6 (1989); Ind. Code § 35–36–2–5 (Supp. 1991). If a State concludes that mental illness is best considered in the context of criminal sentencing, the holding of this case erects no bar to implementing that judgment.

Finally, it should be noted that the great majority of States have adopted policies consistent with the Court's holding. JUSTICE THOMAS claims that 11 States have laws comparable to Louisiana's, see post, at 112–113, n. 9, but even this number overstates the case. Two of the States JUSTICE THOMAS mentions have already amended their laws to provide for the release of acquittees who do not suffer from mental illness but may be dangerous. See Cal. Penal Code Ann. § 1026.2 (West Supp. 1992) (effective Jan. 1, 1994); Va. Code Ann. § 19.2–182.5 (Supp. 1991) (effective July 1, 1992). Three others limit the maximum duration of criminal commitment to reflect the acquittee's specific crimes and hold acquittees in facilities appropriate to their mental condition. See N. J. Stat. Ann. §§ 2C:4–8(b)(3) (West 1982), 30:4–24.2 (West 1981); Wash. Rev. Code §§ 10.77.020(3), 10.77.110(1) (1990); Wis. Stat. §§ 971.17(1), (3)(c) (Supp. 1991). I do not understand the Court's opinion to render such laws necessarily invalid.

Of the remaining six States, two do not condition commitment upon proof of every element of a crime. Kan. Stat. Ann. § 22–3428(1) (Supp. 1990) ("A finding of not guilty by reason of insanity shall constitute a finding that the acquitted person committed an act constituting the offense charged . . . , except that the person did not possess the requisite

criminal intent"); Mont. Code Ann. § 46-14-301(1) (1991) (allowing commitment of persons "found not guilty for the reason that due to a mental disease or defect the defendant could not have a particular state of mind that is an essential element of the offense charged"). Such laws might well fail even under the dissenters' theories. See *post*, at 91-94 (KENNEDY, J., dissenting); *post*, at 103 (THOMAS, J., dissenting).

Today's holding follows directly from our precedents and leaves the States appropriate latitude to care for insanity acquittees in a way consistent with public welfare. Accordingly, I concur in Parts I and II of the Court's opinion and in the judgment of the Court.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, dissenting.

As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution. I agree with the Court's reaffirmation of this first premise. But I submit with all respect that the majority errs in its failure to recognize that the conditions for incarceration imposed by the State in this case are in accord with legitimate and traditional state interests, vindicated after full and fair procedures. The error results from the majority's primary reliance on cases, such as *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), and *Addington* v. *Texas*, 441 U. S. 418 (1979), which define the due process limits for involuntary civil commitment. The majority relies on these civil cases while overruling without mention one of the holdings of our most recent and significant precedent from the criminal context, *Jones* v. *United States*, 463 U. S. 354 (1983).

This is a criminal case. It began one day when petitioner, brandishing a .357 revolver, entered the home of a married couple, intending to steal. Brief for Respondent 1. He

chased them out of their home and fired on police officers who confronted him as he fled. *Id.*, at 1–2. Petitioner was apprehended and charged with aggravated burglary and the illegal use of a weapon in violation of La. Rev. Stat. Ann. §§ 14:60 and 14:94 (West 1986). 563 So. 2d 1138, 1138–1139 (La. 1990). There is no question that petitioner committed the criminal acts charged. Petitioner's response was to deny criminal responsibility based on his mental illness when he committed the acts. He contended his mental illness prevented him from distinguishing between right and wrong with regard to the conduct in question.

Mental illness may bear upon criminal responsibility, as a general rule, in either of two ways: First, it may preclude the formation of *mens rea*, if the disturbance is so profound that it prevents the defendant from forming the requisite intent as defined by state law; second, it may support an affirmative plea of legal insanity. See W. LaFave & A. Scott, Jr., 1 Substantive Criminal Law § 4.1(b), pp. 429–430 (1986) (hereinafter LaFave & Scott). Depending on the content of state law, the first possibility may implicate the State's initial burden, under *In re Winship*, 397 U. S. 358, 364 (1970), to prove every element of the offense beyond a reasonable doubt, while the second possibility does not. *Patterson* v. *New York*, 432 U. S. 197, 206 (1977); *Leland* v. *Oregon*, 343 U. S. 790, 795–796 (1952).

The power of the States to determine the existence of criminal insanity following the establishment of the underlying offense is well established. In *Leland* v. *Oregon*, we upheld a state law that required the defendant to prove insanity beyond a reasonable doubt, observing that this burden had no effect on the State's initial burden to prove every element of the underlying criminal offense.

> "[T]he burden of proof of guilt, and of all the necessary elements of guilt, was placed squarely upon the State. As the jury was told, this burden did not shift, but rested upon the State throughout the trial, just as, ac-

cording to the instructions, appellant was presumed to be innocent until the jury was convinced beyond a reasonable doubt that he was guilty. The jurors were to consider separately the issue of legal sanity *per se*—an issue set apart from the crime charged, to be introduced by a special plea and decided by a special verdict." *Id.*, at 795–796 (footnotes omitted).

As then-JUSTICE REHNQUIST explained the reasoning of *Leland,* "the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." *Mullaney* v. *Wilbur,* 421 U. S. 684, 706 (1975) (concurring opinion); see also *Patterson* v. *New York, supra,* at 206 (defense of insanity considered only after the facts constituting the crime have been proved beyond a reasonable doubt); *Rivera* v. *Delaware,* 429 U. S. 877 (1976) (dismissing challenge to a *Leland* instruction for want of a substantial federal question).

Louisiana law follows the pattern in *Leland* with clarity and precision. Pursuant to La. Code Crim. Proc. Ann., Art. 552 (West 1981), the petitioner entered a dual plea of not guilty and not guilty by reason of insanity. The dual plea, which the majority does not discuss or even mention, ensures that the *Winship* burden remains on the State to prove all the elements of the crime. The Louisiana Supreme Court confirms this in a recent case approving the following jury instruction on the defense of insanity:

> "'In this case the accused has entered a dual plea of not guilty and not guilty by reason of insanity. As a consequence of such a plea, you must first determine whether or not the accused committed a crime [on which you have been instructed]. If you are convinced beyond a reasonable doubt that the accused did commit any of these crimes, any one of these crimes, then you must proceed to a determination of whether he was sane at the time the crime was committed and thereby crimi-

nally responsible for committing it.'" *State* v. *Marmillion*, 339 So. 2d 788, 796 (1976).

The State's burden is unaffected by an adjudication without trial, such as occurred here, because state law requires the trial court to determine, before accepting the plea, that there is a factual basis for it. La. Code Crim. Proc. Ann., Art. 558.1 (West Supp. 1992). There is no dispute that the trial court complied with state law and made the requisite findings.

Compliance with the standard of proof beyond a reasonable doubt is the defining, central feature in criminal adjudication, unique to the criminal law. *Addington*, 441 U. S., at 428. Its effect is at once both symbolic and practical, as a statement of values about respect and confidence in the criminal law, *Winship*, 397 U. S., at 364, and an apportionment of risk in favor of the accused, *id.*, at 369–372 (Harlan, J., concurring). We have often subjected to heightened due process scrutiny, with regard to both purpose and duration, deprivations of physical liberty imposed before a judgment is rendered under this standard. See, *e. g., United States* v. *Salerno*, 481 U. S. 739, 750–751 (1987); *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972); cf. *Jones* v. *United States*, 463 U. S., at 363–364, and n. 12 ("The proof beyond a reasonable doubt that the acquittee committed a criminal act distinguishes this case from *Jackson* v. *Indiana*, 406 U. S. 715 (1972) . . . . In *Jackson* there never was any affirmative proof that the accused had committed criminal acts . . ."). The same heightened due process scrutiny does not obtain, though, once the State has met its burden of proof and obtained an adjudication. It is well settled that upon compliance with *In re Winship*, the State may incarcerate on any reasonable basis. *Chapman* v. *United States*, 500 U. S. 453, 465 (1991); *Williams* v. *Illinois*, 399 U. S. 235, 243 (1970).

As JUSTICE THOMAS observes in his dissent, the majority errs by attaching "talismanic significance" to the fact that petitioner has been adjudicated "not guilty by reason of in-

sanity." *Post*, at 118, n. 13. A verdict of not guilty by reason of insanity is neither equivalent nor comparable to a verdict of not guilty standing alone. We would not allow a State to evade its burden of proof by replacing its criminal law with a civil system in which there is no presumption of innocence and the defendant has the burden of proof. Nor should we entertain the proposition that this case differs from a conviction of guilty because petitioner has been adjudged "not guilty by reason of insanity," rather than "guilty but insane." Petitioner has suggested no grounds on which to distinguish the liberty interests involved or procedural protections afforded as a consequence of the State's ultimate choice of nomenclature. The due process implications ought not to vary under these circumstances. This is a criminal case in which the State has complied with the rigorous demands of *In re Winship*.

The majority's failure to recognize the criminal character of these proceedings and its concomitant standards of proof leads it to conflate the standards for civil and criminal commitment in a manner not permitted by our precedents. *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), and *Addington* v. *Texas, supra,* define the due process limits of involuntary civil commitment. Together they stand for the proposition that in civil proceedings the Due Process Clause requires the State to prove both insanity and dangerousness by clear and convincing evidence. See *O'Connor, supra,* at 575; *Addington, supra,* at 433. Their precedential value in the civil context is beyond question. But it is an error to apply these precedents, as the majority does today, to criminal proceedings. By treating this criminal case as a civil one, the majority overrules a principal holding in *Jones* v. *United States,* 463 U. S., at 354.

In *Jones* we considered the system of criminal commitment enacted by Congress for the District of Columbia. *Id.,* at 356–358. Congress provided for acquittal by reason of insanity only after the Government had shown, beyond a rea-

sonable doubt, that the defendant had committed the crimes charged. *Id.*, at 363–364, and n. 12. In cases of acquittal by reason of insanity, District law provided for automatic commitment followed by periodic hearings, where the insanity acquittee was given the opportunity to prove that he was no longer insane or dangerous. *Id.*, at 357–358, and n. 3. Petitioner in *Jones* contended that *Addington* and *O'Connor* applied to criminal proceedings as well as civil, requiring the Government to prove insanity and dangerousness by clear and convincing evidence before commitment. We rejected that contention. In *Jones* we distinguished criminal from civil commitment, holding that the Due Process Clause permits automatic incarceration after a criminal adjudication and without further process. *Id.*, at 366. The majority today in effect overrules that holding. It holds that "keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Ante*, at 78; see also *ante*, at 80, 85–86. Our holding in *Jones* was clear and to the contrary. We should not so disregard controlling precedent.

Our respect for the Court's opinion in *Jones* should be informed by the recognition that its distinction between civil and criminal commitment is both sound and consistent with long-established precedent. First, as described above, the procedural protections afforded in a criminal commitment surpass those in a civil commitment; indeed, these procedural protections are the most stringent known to our law. Second, proof of criminal conduct in accordance with *In re Winship* eliminates the risk of incarceration "for mere 'idiosyncratic behavior,' [because a] criminal act by definition is not 'within a range of conduct that is generally acceptable.'" *Jones, supra*, at 367, quoting *Addington, supra*, at 426–427. The criminal law defines a discrete category of conduct for which society has reserved its greatest opprobrium and strictest sanctions; past or future dangerousness, as ascer-

tained or predicted in civil proceedings, is different in kind. Third, the State presents distinct rationales for these differing forms of commitment: In the civil context, the State acts in large part on the basis of its *parens patriae* power to protect and provide for an ill individual, while in the criminal context, the State acts to ensure the public safety. See *Addington*, 441 U. S., at 426; S. Brakel, J. Parry, & B. Weiner, The Mentally Disabled and the Law 24–25 (3d ed. 1985). A dismissive footnote, see *ante*, at 76–77, n. 4, cannot overcome these fundamental defects in the majority's opinion.

The majority's opinion is troubling at a further level, because it fails to recognize or account for profound differences between clinical insanity and state-law definitions of criminal insanity. It is by now well established that insanity as defined by the criminal law has no direct analog in medicine or science. "[T]he divergence between law and psychiatry is caused in part by the legal fiction represented by the words 'insanity' or 'insane,' which are a kind of lawyer's catchall and have no clinical meaning." J. Biggs, The Guilty Mind 117 (1955); see also 2 J. Bouvier, Law Dictionary 1590 (8th ed. 1914) ("The legal and the medical ideas of insanity are essentially different, and the difference is one of substance"). Consistent with the general rule that the definition of both crimes and defenses is a matter of state law, see *Patterson* v. *New York*, 432 U. S., at 210, the States are free to recognize and define the insanity defense as they see fit.

> "Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms. . . . It is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers." *Powell* v. *Texas*, 392 U. S. 514, 536–537 (1968) (plurality opinion).

See also *id.*, at 545 (the Constitution does not impose on the States any particular test of criminal responsibility) (Black, J., concurring).

As provided by Louisiana law, and consistent with both federal criminal law and the law of a majority of the States, petitioner was found not guilty by reason of insanity under the traditional *M'Naghten* test. See La. Rev. Stat. Ann. § 14:14 (West 1986); 18 U. S. C. § 17; *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843); 1 LaFave & Scott § 4.2, at 436. Louisiana law provides a traditional statement of this test: "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." La. Rev. Stat. Ann. § 14:14 (West 1986).

Because the *M'Naghten* test for insanity turns on a finding of criminal irresponsibility at the time of the offense, it is quite wrong to place reliance on the fact, as the majority does, that Louisiana does not contend that petitioner is now insane. See *ante*, at 78. This circumstance should come as no surprise, since petitioner was competent at the time of his plea, 563 So. 2d, at 1139, and indeed could not have entered a plea otherwise, see *Drope* v. *Missouri*, 420 U. S. 162, 171 (1975). Present sanity would have relevance if petitioner had been committed as a consequence of civil proceedings, in which dangerous conduct in the past was used to predict similar conduct in the future. It has no relevance here, however. Petitioner has not been confined based on predictions about future behavior but rather for past criminal conduct. Unlike civil commitment proceedings, which attempt to divine the future from the past, in a criminal trial whose outcome turns on *M'Naghten*, findings of past insanity and past criminal conduct possess intrinsic and ultimate significance.

The system here described is not employed in all jurisdictions. Some have supplemented the traditional *M'Naghten* test with the so-called "irresistible impulse" test, see 1 LaFave & Scott § 4.1, at 427–428; others have adopted a test proposed as part of the Model Penal Code, see *ibid.*; and still

others have abolished the defense altogether, see Idaho Code § 18–207(a) (1987); Mont. Code Ann. § 46–14–102 (1992). Since it is well accepted that the States may define their own crimes and defenses, see *supra*, at 96, the point would not warrant further mention, but for the fact that the majority loses sight of it. In describing our decision in *Jones*, the majority relies on our statement that a verdict of not guilty by reason of insanity establishes that the defendant "'committed the act because of mental illness.'" *Ante*, at 76, quoting *Jones*, 463 U. S., at 363. That was an accurate statement in *Jones* but not here. The defendant in *Jones* was acquitted under the *Durham* test for insanity, which excludes from punishment criminal conduct that is the product of a mental disease or defect. See *Bethea* v. *United States*, 365 A. 2d 64, 69, n. 11 (1976); see also *Durham* v. *United States*, 94 U. S. App. D. C. 228, 240–241, 214 F. 2d 862, 874–875 (1954). In a *Durham* jurisdiction, it would be fair to say, as the Court did in *Jones*, that a defendant acquitted by reason of insanity "committed the act because of mental illness." *Jones*, *supra*, at 363. The same cannot be said here, where insanity under *M'Naghten* proves only that the defendant could not have distinguished between right and wrong. It is no small irony that the aspect of *Jones* on which the majority places greatest reliance, and indeed cites as an example of its adherence to *Jones*, has no bearing on the Louisiana statute at issue here. See *ante*, at 76, and n. 4.

The establishment of a criminal act and of insanity under the *M'Naghten* regime provides a legitimate basis for confinement. Although Louisiana has chosen not to punish insanity acquittees, the State has not surrendered its interest in incapacitative incarceration. The Constitution does not require any particular model for criminal confinement, *Harmelin* v. *Michigan,* 501 U. S. 957, 999 (1991) (KENNEDY, J., concurring in judgment) ("The federal and state criminal systems have accorded different weights at different times

to the penological goals of retribution, deterrence, incapacitation, and rehabilitation"); *Williams* v. *New York,* 337 U. S. 241, 246 (1949), and upon compliance with *In re Winship,* the State may incarcerate on any reasonable basis, see *supra,* at 93. Incapacitation for the protection of society is not an unusual ground for incarceration. "[I]solation of the dangerous has always been considered an important function of the criminal law," *Powell* v. *Texas,* 392 U. S. 514, 539 (1968) (Black, J., concurring), and insanity acquittees are a special class of offenders proved dangerous beyond their own ability to comprehend. The wisdom of incarceration under these circumstances is demonstrated by its high level of acceptance. Every State provides for discretionary or mandatory incarceration of insanity acquittees, 1 LaFave & Scott § 4.6(a), at 510, and as JUSTICE THOMAS observes in his dissent, provisions like those in Louisiana, predicated on dangerousness alone, have been endorsed by the Model Penal Code and adopted by the legislatures of no fewer than 11 other States. See *post,* at 111–112, and nn. 8 and 9.

It remains to be seen whether the majority, by questioning the legitimacy of incapacitative incarceration, puts in doubt the confinement of persons other than insanity acquittees. Parole release provisions often place the burden of proof on the prisoner to prove his lack of dangerousness. To use a familiar example, under the federal parole system in place until the enactment of the Sentencing Guidelines, an inmate could not be released on parole unless he established that his "release would not jeopardize the public welfare." 18 U. S. C. § 4206(a)(2) (1982 ed.), repealed 98 Stat. 2027; see also 28 CFR § 2.18 (1991). This requirement reflected "the incapacitative aspect of the use of imprisonment which has the effect of denying the opportunity for future criminality, at least for a time." U. S. Dept. of Justice, United States Parole Commission Rules and Procedures Manual 69 (July 24, 1989). This purpose is consistent with the parole release provisions of Alabama, Colorado, Hawaii, Massachusetts,

Michigan, New York, and the District of Columbia, to name just a few. See N. Cohen & J. Gobert, Law of Probation and Parole § 3.05, p. 109, and n. 103 (1983). It is difficult for me to reconcile the rationale of incapacitative incarceration, which underlies these regimes, with the opinion of the majority, which discounts its legitimacy.

I also have difficulty with the majority's emphasis on the conditions of petitioner's confinement. In line with JUSTICE O'CONNOR's concurring opinion, see *ante*, at 87–88, the majority emphasizes the fact that petitioner has been confined in a mental institution, see *ante*, at 77–78, 78–79, 82, suggesting that his incarceration might not be unconstitutional if undertaken elsewhere. The majority offers no authority for its suggestion, while JUSTICE O'CONNOR relies on a reading of *Vitek* v. *Jones*, 445 U. S. 480 (1980), which was rejected by the Court in *Jones* v. *United States*. See *ante*, at 87–88, citing *Jones* v. *United States, supra,* at 384–385 (Brennan, J., dissenting). The petitioner did not rely on this argument at any point in the proceedings, and we have not the authority to make the assumption, as a matter of law, that the conditions of petitioner's confinement are in any way infirm. Ours is not a case, as in *Vitek* v. *Jones,* where the State has stigmatized petitioner by placing him in a mental institution when he should have been placed elsewhere. *Jones* v. *United States* is explicit on this point: "A criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself, and thus the commitment causes little additional harm in this respect." 463 U. S., at 367, n. 16. Nor is this a case, as in *Washington* v. *Harper,* 494 U. S. 210 (1990), in which petitioner has suffered some further deprivation of liberty to which independent due process protections might attach. Both the fact and conditions of confinement here are attributable to petitioner's criminal conduct and subsequent decision to plead insanity. To the extent the majority relies on the conditions of petitioner's

confinement, its decision is without authority, and most of its opinion is nothing more than confusing dicta.

I submit that today's decision is unwarranted and unwise. I share the Court's concerns about the risks inherent in requiring a committed person to prove what can often be imprecise, but as JUSTICE THOMAS observes in his dissent, this is not a case in which the period of confinement exceeds the gravity of the offense or in which there are reasons to believe the release proceedings are pointless or a sham. *Post*, at 114, n. 10. Petitioner has been incarcerated for less than one-third the statutory maximum for the offenses proved by the State. See La. Rev. Stat. Ann. §§ 14:60 (aggravated burglary) and 14:94 (illegal use of a weapon) (West 1986). In light of these facts, the majority's repeated reference to "indefinite detention," with apparent reference to the potential duration of confinement, and not its lack of a fixed end point, has no bearing on this case. See *ante*, at 77, n. 4, 82, 83, n. 6; cf. *ante*, at 77, n. 4 (curious suggestion that confinement has been extended beyond an initial term of years). It is also significant to observe that this is not a case in which the incarcerated subject has demonstrated his nondangerousness. Within the two months before his release hearing, petitioner had been sent to a maximum security section of the Feliciana Forensic Facility because of altercations with another patient. 563 So. 2d, at 1141. Further, there is evidence in the record which suggests that petitioner's initial claim of insanity may have been feigned. The medical panel that reviewed petitioner's request for release stated that "there is no evidence of mental illness," and indeed that there was "never any evidence of mental illness or disease since admission." App. 10. In sum, it would be difficult to conceive of a less compelling situation for the imposition of sweeping new constitutional commands such as the majority imposes today.

Because the majority conflates the standards for civil and criminal commitment, treating this criminal case as though

it were civil, it upsets a careful balance relied upon by the States, not only in determining the conditions for continuing confinement, but also in defining the defenses permitted for mental incapacity at the time of the crime in question. In my view, having adopted a traditional and well-accepted test for determining criminal insanity, and having complied with the rigorous demands of *In re Winship*, the State possesses the constitutional authority to incarcerate petitioner for the protection of society. I submit my respectful dissent.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Louisiana statutory scheme the Court strikes down today is not some quirky relic of a bygone age, but a codification of the current provisions of the American Law Institute's Model Penal Code. Invalidating this quite reasonable scheme is bad enough; even worse is the Court's failure to explain precisely what is wrong with it. In parts of its opinion, the Court suggests that the scheme is unconstitutional because it provides for the continued confinement of insanity acquittees who, although still dangerous, have "recovered" their sanity. *Ante*, at 77 ("[T]he committed acquittee is *entitled to release* when he has recovered his sanity *or* is no longer dangerous") (emphasis added; internal quotation marks omitted). In other parts of the opinion, the Court suggests—and the concurrence states explicitly—that the constitutional flaw with this scheme is *not* that it provides for the confinement of sane insanity acquittees, but that it (allegedly) provides for their "indefinite" confinement in a mental facility. *Ante*, at 82; *ante*, at 86–87 (O'CONNOR, J., concurring in part and concurring in judgment). Nothing in the Constitution, this Court's precedents, or our society's traditions authorizes the Court to invalidate the Louisiana scheme on either of these grounds. I would therefore affirm the judgment of the Louisiana Supreme Court.

## I

The Court errs, in large part, because it fails to examine in detail the challenged statutory scheme and its application in this case. Under Louisiana law, a verdict of "not guilty by reason of insanity" differs significantly from a verdict of "not guilty." A simple verdict of not guilty following a trial means that the State has failed to prove all of the elements of the charged crime beyond a reasonable doubt. See, *e. g.*, *State* v. *Messiah*, 538 So. 2d 175, 180 (La. 1988) (citing *In re Winship*, 397 U. S. 358 (1970)); cf. La. Code Crim. Proc. Ann., Art. 804(A)(1) (West 1969). A verdict of not guilty by reason of insanity, in contrast, means that the defendant *committed the crime*, but established that he was "incapable of distinguishing between right and wrong" with respect to his criminal conduct. La. Rev. Stat. Ann. § 14:14 (West 1986). Insanity, in other words, is an affirmative defense that does not negate the State's proof, but merely "exempt[s the defendant] from criminal responsibility." *Ibid.* As the Louisiana Supreme Court has summarized: "The State's traditional burden of proof is to establish beyond a reasonable doubt all necessary elements of the offense. *Once this rigorous burden of proof has been met,* it having been shown that defendant *has committed a crime,* the defendant . . . bear[s] the burden of establishing his defense of insanity in order to escape punishment." *State* v. *Marmillion,* 339 So. 2d 788, 796 (1976) (emphasis added). See also *State* v. *Surrency,* 88 So. 240, 244 (La. 1921).

Louisiana law provides a procedure for a judge to render a verdict of not guilty by reason of insanity upon a plea without a trial. See La. Code Crim. Proc. Ann., Art. 558.1 (West Supp. 1991). The trial court apparently relied on this procedure when it committed Foucha. See 563 So. 2d 1138, 1139,

n. 3 (La. 1990).[1]  After ordering two experts to examine Foucha, the trial court issued the following judgment:

> "After considering the law and the evidence adduced in this matter, the Court finds that the accused, Terry Foucha, is unable to appreciate the usual, natural and probable consequences of his acts; that he is unable to distinguish right from wrong; that he is a menace to himself and to others; and that he was insane at the time of the commission of the above crimes and that he is presently insane."  App. 6.

After adjudicating a defendant not guilty by reason of insanity, a trial court must hold a hearing on the issue of dangerousness.  The law specifies that "[i]f the court determines that the defendant cannot be released without a danger to others or to himself, it shall order him committed to . . . [a] mental institution."  La. Code Crim. Proc. Ann., Art. 654 (West Supp. 1991).[2]  " 'Dangerous to others' means

---

[1] Under La. Code Crim. Proc. Ann., Art. 558.1 (West Supp. 1991), a criminal defendant apparently concedes that he committed the crime, and advances his insanity as the sole ground on which to avoid conviction.  Foucha does not challenge the procedures whereby he was adjudicated not guilty by reason of insanity; nor does he deny that he committed the crimes with which he was charged.

[2] Article 654 provides in pertinent part:

"When a defendant is found not guilty by reason of insanity in any [noncapital] felony case, the court shall remand him to the parish jail or to a private mental institution approved by the court and shall promptly hold a contradictory hearing at which the defendant shall have the burden of proof, to determine whether the defendant can be discharged or can be released on probation, without danger to others or to himself.  If the court determines that the defendant cannot be released without danger to others or to himself, it shall order him committed to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment.  If the court determines that the defendant can be discharged or released on probation without danger to others or to himself, the court shall either order his discharge, or order his release on probation subject to specified conditions for a fixed or an indeterminate period.  The court shall assign written findings of fact and conclusions of

the condition of a person whose behavior or significant threats support a *reasonable expectation* that there is a *substantial risk* that he will inflict physical harm upon another person *in the near future*." La. Rev. Stat. Ann. § 28:2(3) (West 1986) (emphasis added). " 'Dangerous to self' means the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person." § 28:2(4).

After holding the requisite hearings, the trial court in this case ordered Foucha committed to the Feliciana Forensic Facility. After his commitment, Foucha was entitled, upon request, to another hearing six months later and at yearly intervals after that. See La. Code Crim. Proc. Ann., Art. 655(B) (West Supp. 1991).[3] In addition, Louisiana law provides that a release hearing must be held upon recommendation by the superintendent of a mental institution. See Art. 655(A).[4] In early 1988, Feliciana's superintendent recom-

---

law; however, the assignment of reasons shall not delay the implementation of judgment."

[3] Article 655(B) provides:

"A person committed pursuant to Article 654 may make application to the review panel for discharge or for release on probation. Such application by a committed person may not be filed until the committed person has been confined for a period of at least six months after the original commitment. If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a hearing following notice to the district attorney. If the recommendation of the review panel or the court is adverse, the applicant shall not be permitted to file another application until one year has elapsed from the date of determination."

[4] Article 655(A) provides:

"When the superintendent of a mental institution is of the opinion that a person committed pursuant to Article 654 can be discharged or can be released on probation, without danger to others or to himself, he shall recommend the discharge or release of the person in a report to a review panel comprised of the person's treating physician, the clinical director of the facility to which the person is committed, and a physician or psychologist who served on the sanity commission which recommended commitment of the person. If any member of the panel is unable to serve, a

mended that Foucha be released, and a three-doctor panel met to review the case. On March 21, 1988, the panel issued a report pursuant to Article 656.[5] The panel concluded that "there is no evidence of mental illness." App. 10. In fact, the panel stated that there was *never* any evidence of mental illness or disease since admission." *Ibid.* (emphasis added). Although the panel did not discuss whether Foucha was dangerous, it recommended to the trial court that he be conditionally released.

As a result of these recommendations, the trial court scheduled a hearing to determine whether Foucha should be released. Under La. Code Crim. Proc. Ann., Art. 657 (West Supp. 1991),[6] Foucha had the burden at this hearing to prove

_____

physician or a psychologist engaged in the practice of clinical or counseling psychology with at least three years' experience in the field of mental health shall be appointed by the remaining members. The panel shall review all reports received promptly. After review, the panel shall make a recommendation to the court by which the person was committed as to the person's mental condition and whether he can be discharged, conditionally or unconditionally, or placed on probation, without being a danger to others or himself. If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a contradictory hearing following notice to the district attorney."

[5] Article 656 provides:

"A. Upon receipt of the superintendent's report, filed in conformity with Article 655, the review panel may examine the committed person and report, to the court promptly, whether he can be safely discharged, conditionally or unconditionally, or be safely released on probation, without danger to others or to himself.

"B. The committed person or the district attorney may also retain a physician to examine the committed person for the same purpose. The physician's report shall be filed with the court."

[6] Article 657 provides:

"After considering the report or reports filed pursuant to Articles 655 and 656, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person can be discharged, or can be released on probation, without danger to others or to

that he could be released without danger to others or to himself. The court appointed two experts (the same doctors who had examined Foucha at the time of his original commitment) to evaluate his dangerousness. These doctors concluded that Foucha "is presently in remission from mental illness," but said that they could not "certify that he would not constitute a menace to himself or to others if released." App. 12. On November 29, 1988, the trial court held the hearing, at which Foucha was represented by counsel. The court concluded that Foucha "is a danger to himself, and to others," *id.*, at 24, and ordered that he be returned to Feliciana.[7]

## II

The Court today concludes that Louisiana has denied Foucha both procedural and substantive due process. In my view, each of these conclusions is wrong. I shall discuss them in turn.

## A

What the Court styles a "procedural" due process analysis is in reality an equal protection analysis. The Court first asserts (contrary to state law) that Foucha cannot be held as an insanity acquittee once he "becomes" sane. *Ante*, at 78–79.

---

himself. At the hearing the burden shall be upon the committed person to prove that he can be discharged, or can be released on probation, without danger to others or to himself. After the hearing, and upon filing written findings of fact and conclusions of law, the court may order the committed person discharged, released on probation subject to specified conditions for a fixed or an indeterminate period, or recommitted to the state mental institution. Notice to the counsel for the committed person and the district attorney of the contradictory hearing shall be given at least thirty days prior to the hearing."

[7] The Louisiana Supreme Court concluded that the trial court did not abuse its discretion in finding that Foucha had failed to prove that he could be released without danger to others or to himself under La. Code Crim. Proc. Ann., Art. 657 (West Supp. 1991). See 563 So. 2d 1138, 1141 (1990). That issue is not now before us.

That being the case, he is entitled to the same treatment as civil committees. *"[I]f Foucha can no longer be held as an insanity acquittee,"* the Court says, "he is entitled to constitutionally adequate procedures [those afforded in civil commitment proceedings] to establish the grounds for his confinement." *Ante,* at 79 (emphasis added). This, of course, is an equal protection argument (there being no rational distinction between A and B, the State must treat them the same); the Court does not even pretend to examine the fairness of the release procedures the State has provided.

I cannot agree with the Court's conclusion because I believe that there is a real and legitimate distinction between insanity acquittees and civil committees that justifies procedural disparities. Unlike civil committees, who have *not* been found to have harmed society, insanity acquittees have been found in a judicial proceeding to have committed a criminal act.

That distinction provided the *ratio decidendi* for our most relevant precedent, *Jones* v. *United States,* 463 U. S. 354 (1983). That case involved a man who had been *automatically* committed to a mental institution after being acquitted of a crime by reason of insanity in the District of Columbia (*i. e.,* he had not been given the procedures afforded to civil committees). We rejected both of his procedural due process challenges to his commitment. First, we held that an insanity acquittal justified automatic commitment of the acquittee (even though he might *presently* be sane), because Congress was entitled to decide that the verdict provided a *reasonable basis* for inferring dangerousness and insanity at the time of commitment. *Id.,* at 366. The Government's interest in avoiding a *de novo* commitment hearing following every insanity acquittal, we said, outweighed the acquittee's interest in avoiding unjustified institutionalization. *Ibid.* Second, we held that the Constitution did not require, as a predicate for the indefinite commitment of insanity acquittees, proof of insanity by "clear and convincing" evidence, as

required for civil committees by *Addington* v. *Texas*, 441 U. S. 418 (1979). There are, we recognized, "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." *Jones*, 463 U. S., at 367. In sharp contrast to a civil committee, an insanity acquittee is institutionalized only where "the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness," and thus "there is good reason for diminished concern as to the risk of error." *Ibid.* (emphasis in original). "More important, the proof that he committed a criminal act . . . eliminates the risk that he is being committed for mere 'idiosyncratic behavior.'" *Ibid.* Thus, we concluded, the preponderance of the evidence standard comports with due process for commitment of insanity acquittees. *Id.*, at 368. "[I]nsanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Id.*, at 370.

The Court today attempts to circumvent *Jones* by declaring that a State's interest in treating insanity acquittees differently from civil committees evaporates the instant an acquittee "becomes sane." I do not agree. As an initial matter, I believe that it is unwise, given our present understanding of the human mind, to suggest that a determination that a person has "regained sanity" is precise. "Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness." *Ake* v. *Oklahoma*, 470 U. S. 68, 81 (1985). Indeed,

> "[w]e have recognized repeatedly the 'uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.' The lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular

110

deference to reasonable legislative judgments." *Jones, supra,* at 365, n. 13 (quoting *Greenwood* v. *United States,* 350 U. S. 366, 375 (1956); citations omitted).

*In this very case,* the panel that evaluated Foucha in 1988 concluded that there was *"never* any evidence of mental illness or disease since admission," App. 10; the trial court, of course, concluded that Foucha was "presently insane," *id.,* at 6, at the time it accepted his plea and sent him to Feliciana.

The distinction between civil committees and insanity acquittees, after all, turns *not* on considerations of present sanity, but instead on the fact that the latter have "already unhappily manifested the reality of anti-social conduct," *Dixon* v. *Jacobs,* 138 U. S. App. D. C. 319, 334, 427 F. 2d 589, 604 (1970) (Leventhal, J., concurring). *"[T]he prior anti-social conduct* of an insanity acquittee justifies treating such a person differently from ones otherwise civilly committed for purposes of deciding whether the patient should be released." *Powell* v. *Florida,* 579 F. 2d 324, 333 (CA5 1978) (emphasis added); see also *United States* v. *Ecker,* 177 U. S. App. D. C. 31, 50, 543 F. 2d 178, 197 (1976), cert. denied, 429 U. S. 1063 (1977). While a State may renounce a punitive interest by offering an insanity defense, it does not follow that, once the acquittee's sanity is "restored," the State is required to ignore his criminal act, and to renounce all interest in protecting society from him. "The state has a substantial interest in avoiding premature release of insanity acquittees, who have committed acts constituting felonies and have been declared dangerous to society." *Hickey* v. *Morris,* 722 F. 2d 543, 548 (CA9 1983).

Furthermore, the Federal Constitution does not require a State to "ignore the danger of 'calculated abuse of the insanity defense.'" *Warren* v. *Harvey,* 632 F. 2d 925, 932 (CA2 1980) (quoting *United States* v. *Brown,* 155 U. S. App. D. C. 402, 407, 478 F. 2d 606, 611 (1973)). A State that decides to offer its criminal defendants an insanity defense, which the defendant himself is given the choice of invoking, is surely

allowed to attach to that defense certain consequences that prevent abuse. Cf. *Lynch* v. *Overholser*, 369 U. S. 705, 715 (1962) ("Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity").

> "In effect, the defendant, by raising the defense of insanity—and he alone can raise it—postpones a determination of his present mental health and acknowledges the right of the state, upon accepting his plea, to detain him for diagnosis, care, and custody in a mental institution until certain specified conditions are met. . . . [C]ommitment via the criminal process . . . thus is more akin to 'voluntary' than 'involuntary' civil commitment." Goldstein & Katz, Dangerousness and Mental Illness, Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity, 70 Yale L. J. 225, 230 (1960) (footnote omitted).

A State may reasonably decide that the integrity of an insanity-acquittal scheme requires the continued commitment of insanity acquittees who remain dangerous. Surely, the citizenry would not long tolerate the insanity defense if a serial killer who convinces a jury that he is not guilty by reason of insanity is returned to the streets immediately after trial by convincing a different factfinder that he is not in fact insane.

As the American Law Institute has explained:

> "It seemed preferable to the Institute to make dangerousness the criterion for continued custody, rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, [an insanity acquittee] may still be dangerous because of factors in his personality and background other than mental disease. Also, such a

standard provides a means for the control of the oc-
casional defendant who may be quite dangerous but
who successfully feigned mental disease to gain an
acquittal." Model Penal Code § 4.08, Comment 3,
pp. 259–260 (1985).[8]

That this is a reasonable legislative judgment is underscored
by the fact that it has been made by no fewer than 11 state
legislatures, in addition to Louisiana's, which expressly pro-
vide that insanity acquittees shall not be released as long as
they are dangerous, regardless of sanity.[9]

---

[8] The relevant provision of the Model Penal Code, strikingly similar to
Article 657 of the Louisiana Code of Criminal Procedure, see *supra*, n. 6,
provides in part as follows:

"If the Court is satisfied by the report filed pursuant to Subsection (2) of
this Section and such testimony of the reporting psychiatrists as the Court
deems necessary that the committed person may be discharged or released
on condition without danger to himself or others, the Court shall order his
discharge or his release on such conditions as the Court determines to be
necessary. If the Court is not so satisfied, it shall promptly order a hear-
ing to determine whether such person may safely be discharged or re-
leased. Any such hearing shall be deemed a civil proceeding and the bur-
den shall be upon the committed person to prove that he may safely be
discharged or released." Model Penal Code § 4.08(3) (Proposed Official
Draft 1962).

[9] See Cal. Penal Code Ann. § 1026.2(e) (West Supp. 1992) (insanity acquit-
tee not entitled to release until court determines that he "will not be a
danger to the health and safety of others, including himself"); Del. Code
Ann., Tit. 11, § 403(b) (1987) (insanity acquittee shall be kept institutional-
ized until court "is satisfied that the public safety will not be endangered
by his release"); Haw. Rev. Stat. § 704–415 (1985) (insanity acquittee not
entitled to release until court satisfied that acquittee "may safely be dis-
charged or released"); Iowa Rule Crim. Proc. 21.8(e) (insanity acquittee
not entitled to release as long as "court finds that continued custody and
treatment are necessary to protect the safety of the [acquittee's] self or
others"); Kan. Stat. Ann. § 22–3428(3) (Supp. 1990) (insanity acquittee not
entitled to release until "the court finds by clear and convincing evidence
that [he] will not be likely to cause harm to self or others if released or
discharged"); Mont. Code Ann. § 46–14–301(3) (1991) (insanity acquittee
not entitled to release until he proves that he "may safely be released");

The Court suggests an alternative "procedural" due process theory that is, if anything, even less persuasive than its principal theory. "[K]eeping Foucha against his will *in a mental institution* is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Ante*, at 78 (emphasis added). The Court cites *Vitek* v. *Jones*, 445 U. S. 480 (1980), as support. There are two problems with this theory. First, it is illogical: Louisiana cannot possibly extend Foucha's incarceration by adding the procedures afforded to civil committees, since it is impossible to civilly commit someone who is not presently

N. J. Stat. Ann. § 2C:4–9 (West 1982) (insanity acquittee not entitled to release or discharge until court satisfied that he is not "danger to himself or others"); N. C. Gen. Stat. § 122C–268.1(i) (Supp. 1991) (insanity acquittee not entitled to release until he "prove[s] by a preponderance of the evidence that he is no longer dangerous to others"); Va. Code Ann. § 19.2–181(3) (1990) (insanity acquittee not entitled to release until he proves "that he is not insane or mentally retarded *and* that his discharge would not be dangerous to the public peace and safety or to himself" (emphasis added)); Wash. Rev. Code § 10.77.200(2) (1990) ("The burden of proof [at a release hearing] shall be upon the [insanity acquittee] to show by a preponderance of the evidence that [he] may be finally discharged without substantial danger to other persons, and without presenting a substantial likelihood of committing felonious acts jeopardizing public safety or security"); Wis. Stat. § 971.17(4) (Supp. 1991) (insanity acquittee not entitled to release where court "finds by clear and convincing evidence that the [acquittee] would pose a significant risk of bodily harm to himself or herself or to others of serious property damage if conditionally released").

The Court and the concurrence dispute this list of statutes. *Ante*, at 84–85, n. 6; *ante*, at 89 (O'CONNOR, J., concurring in part and concurring in judgment). They note that two of the States have enacted new laws, not yet effective, modifying their current absolute prohibitions on the release of dangerous insanity acquittees; that courts in two other States have apparently held that mental illness is a prerequisite to confinement; and that three of the States place caps of some sort on the duration of the confinement of insanity acquittees. Those criticisms miss my point. I cite the 11 state statutes above only to show that the legislative judgments underlying Louisiana's scheme are far from unique or freakish, and that there is no well-established practice in our society, either past or present, of automatically releasing sane-but-dangerous insanity acquittees.

mentally ill. Second, the theory is not supported by *Vitek*. Stigmatization (our concern in *Vitek*) is simply not a relevant consideration where insanity acquittees are involved. As we explained in *Jones:* "A criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself, and thus the commitment causes little additional harm in this respect." 463 U. S., at 367, n. 16; see also *Warren* v. *Harvey*, 632 F. 2d, at 931–932. (This is in sharp contrast to situations involving civil committees. See *Addington*, 441 U. S., at 425–426; *Vitek, supra*, at 492–494.) It is implausible, in my view, that a person who chooses to plead not guilty by reason of insanity and then spends several years in a mental institution becomes unconstitutionally stigmatized by continued confinement in the institution after "regaining" sanity.

In my view, there was no procedural due process violation in this case. Articles 654, 655, and 657 of the Louisiana Code of Criminal Procedure, as noted above, afford insanity acquittees the opportunity to obtain release by demonstrating at regular intervals that they no longer pose a threat to society. These provisions also afford judicial review of such determinations. Pursuant to these procedures, and based upon testimony of experts, the Louisiana courts determined not to release Foucha at this time because the evidence did not show that he ceased to be dangerous. Throughout these proceedings, Foucha was represented by state-appointed counsel. I see no plausible argument that these procedures denied Foucha a fair hearing on the issue involved or that Foucha needed additional procedural protections.[10] See *Mathews* v. *Eldridge*, 424 U. S. 319 (1976); *Patterson* v. *New York*, 432 U. S. 197 (1977); cf. *Addington, supra*, at 427–432;

---

[10] Foucha has not argued that the State's procedures, *as applied*, are a sham. This would be a different case if Foucha had established that the statutory mechanisms for release were nothing more than window dressing, and that the State in fact confined insanity acquittees indefinitely without meaningful opportunity for review and release.

*Jones, supra,* at 363–368; *Benham* v. *Ledbetter,* 785 F. 2d 1480, 1486–1488 (CA11 1986).[11]

## B

The Court next concludes that Louisiana's statutory scheme must fall because it violates Foucha's *substantive* due process rights. *Ante,* at 80–83, and n. 6. I disagree. Until today, I had thought that the analytical framework for evaluating substantive due process claims was relatively straightforward. Certain substantive rights we have recognized as "fundamental"; legislation trenching upon these is subjected to "strict scrutiny," and generally will be invalidated unless the State demonstrates a compelling interest and narrow tailoring. Such searching judicial review of state legislation, however, is the exception, not the rule, in our democratic and federal system; we have consistently emphasized that "the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable." *Regents of University of Michigan* v. *Ewing,* 474 U. S. 214, 226 (1985) (internal quotation marks omitted). Except in the unusual case where a fundamental right is infringed, then, federal judicial scrutiny of the substance of state legislation under the Due Process Clause of the Fourteenth Amendment is not exacting. See, *e. g., Bowers* v. *Hardwick,* 478 U. S. 186, 191–196 (1986).

In striking down Louisiana's scheme as a violation of substantive rights guaranteed by the Due Process Clause, the

---

[11] As explained above, the Court's "procedural" due process analysis is essentially an equal protection analysis: The Court first disregards the differences between "sane" insanity acquittees and civil committees, and then simply asserts that Louisiana cannot deny Foucha the procedures it gives civil committees. A plurality repeats this analysis in its cumulative equal protection section. See *ante,* at 84–86. As explained above, I believe that there are legitimate differences between civil committees and insanity acquittees, even after the latter have "become" sane. Therefore, in my view, Louisiana has not denied Foucha equal protection of the laws. Cf. *Jones* v. *United States,* 463 U. S. 354, 362, n. 10 (1983).

Court today ignores this well-established analytical framework. First, the Court never explains whether we are dealing here with a fundamental right, and, if so, what right. Second, the Court never discloses what standard of review applies. Indeed, the Court's opinion is contradictory on both these critical points.

As to the first point: The Court begins its substantive due process analysis by invoking the substantive right to "[f]reedom from bodily restraint." *Ante,* at 80. Its discussion then proceeds as if the problem here is that Foucha, an insanity acquittee, continues to be *confined* after recovering his sanity, *ante,* at 80–81; thus, the Court contrasts this case to *United States* v. *Salerno,* 481 U. S. 739 (1987), a case involving the confinement of pretrial detainees. But then, abruptly, the Court shifts liberty interests. The liberty interest at stake here, we are told, is *not* a liberty interest in being free "from bodily restraint," but instead the more specific (and heretofore unknown) "liberty interest under the Constitution *in being freed from [1] indefinite confinement [2] in a mental facility." Ante,* at 82 (emphasis added). See also *ante,* at 86–87 (O'CONNOR, J,, concurring in part and concurring in judgment). So the problem in this case is apparently *not* that Louisiana continues to confine insanity acquittees who have "become" sane (although earlier in the opinion the Court interprets our decision in *Jones* as having held that such confinement is unconstitutional, see *ante,* at 77–78), but that under Louisiana law, "sane" insanity acquittees may be held "indefinitely" "in a mental facility."

As to the second point: "A dispute regarding the appropriate standard of review may strike some as a lawyers' quibble over words, but it is not." *Metro Broadcasting, Inc.* v. *FCC,* 497 U. S. 547, 610 (1990) (O'CONNOR, J., dissenting). The standard of review determines when the Due Process Clause of the Fourteenth Amendment will override a State's substantive policy choices, as reflected in its laws. The Court initially says that "[d]ue process requires that the na-

ture of commitment bear some *reasonable relation* to the purpose for which the individual is committed." *Ante,* at 79 (emphasis added). Later in its opinion, however, the Court states that the Louisiana scheme violates substantive due process *not* because it is not "reasonably related" to the State's purposes, but instead because its detention provisions are not "sharply focused" or "carefully limited," in contrast to the scheme we upheld in *Salerno. Ante,* at 81. Does that mean that the same standard of review applies here that we applied in *Salerno,* and, if so, what is that standard? The Court quite pointedly avoids answering these questions. Similarly, JUSTICE O'CONNOR does not reveal exactly what standard of review she believes applicable, but appears to advocate a heightened standard heretofore unknown in our case law. *Ante,* at 87–88 ("It might therefore be permissible for Louisiana to confine an insanity acquittee who has regained sanity if . . . the nature and duration of detention were *tailored* to reflect *pressing* public safety concerns related to the acquittee's continuing dangerousness" (emphasis added)).

To the extent the Court invalidates the Louisiana scheme on the ground that it violates some general substantive due process right to "freedom from bodily restraint" that triggers strict scrutiny, it is wrong—and dangerously so. To the extent the Court suggests that Louisiana has violated some more limited right to freedom from indefinite commitment in a mental facility (a right, by the way, never asserted by Foucha in this or any other court) that triggers some unknown standard of review, it is also wrong. I shall discuss these two possibilities in turn.

1

I fully agree with the Court, *ante,* at 80, and with JUSTICE KENNEDY, *ante,* at 90, that freedom from involuntary confinement is at the heart of the "liberty" protected by the Due Process Clause. But a liberty interest *per se* is not the same thing as a fundamental right. Whatever the exact scope of

the fundamental right to "freedom from bodily restraint" recognized by our cases,[12] it certainly cannot be defined at the exceedingly great level of generality the Court suggests today. There is simply no basis in our society's history or in the precedents of this Court to support the existence of a sweeping, general fundamental right to "freedom from bodily restraint" applicable to *all* persons in *all* contexts. If convicted prisoners could claim such a right, for example, we would subject all prison sentences to strict scrutiny. This we have consistently refused to do. See, *e. g.*, *Chapman* v. *United States*, 500 U. S. 453, 465 (1991).[13]

The critical question here, then, is whether *insanity acquittees* have a fundamental right to "freedom from bodily

[12] The Court cites only *Youngberg* v. *Romeo*, 457 U. S. 307, 316 (1982), in support of its assertion that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," *ante*, at 80. What "freedom from bodily restraint" meant in that case, however, is completely different from what the Court uses the phrase to mean here. *Youngberg* involved the substantive due process rights of an institutionalized, mentally retarded patient who had been restrained *by shackles placed on his arms* for portions of each day. See 457 U. S., at 310, and n. 4. What the Court meant by "freedom from bodily restraint," then, was quite literally freedom not to be physically strapped to a bed. That case in no way established the broad "freedom from bodily restraint"—apparently meaning freedom from *all* involuntary confinement—that the Court discusses today.

[13] Unless the Court wishes to overturn this line of cases, its substantive due process analysis must rest entirely on the fact that an insanity acquittee has not been *convicted* of a crime. Conviction is, of course, a significant event. But I am not sure that it deserves talismanic significance. Once a State proves beyond a reasonable doubt that an individual has committed a crime, it is, at a minimum, not obviously a matter of federal constitutional concern whether the State proceeds to label that individual "guilty," "guilty but insane," or "not guilty by reason of insanity." A State may just as well decide to label its verdicts "A," "B," and "C." It is surely rather odd to have rules of federal constitutional law turn entirely upon the *label* chosen by a State. Cf. *Railway Express Agency, Inc.* v. *Virginia*, 358 U. S. 434, 441 (1959) (constitutionality of state action should not turn on "magic words").

restraint" that triggers strict scrutiny of their confinement. Neither Foucha nor the Court provides any evidence that our society has ever recognized any such right. To the contrary, historical evidence shows that many States have long provided for the continued institutionalization of insanity acquittees who remain dangerous. See, *e. g.,* H. Weihofen, Insanity as a Defense in Criminal Law 294–332 (1933); A. Goldstein, The Insanity Defense 148–149 (1967).

Moreover, this Court has *never* applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill, much less to laws involving the confinement of insanity acquittees. To the contrary, until today we have subjected the substance of such laws only to very deferential review. Thus, in *Jackson* v. *Indiana,* 406 U. S. 715, 738 (1972), we held that Indiana's provisions for the indefinite institutionalization of incompetent defendants violated substantive due process because they did not bear any "reasonable" relation to the purpose for which the defendant was committed. Similarly, in *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975), we held that the confinement of a nondangerous mentally ill person was unconstitutional *not* because the State failed to show a compelling interest and narrow tailoring, but because the State had *no legitimate interest whatsoever* to justify such confinement. See *id.,* at 575–576. See also *id.,* at 580 (Burger, C. J., concurring) ("Commitment must be justified on the basis of a *legitimate* state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist" (emphasis added)).

Similarly, in *Jones,* we held (in addition to the procedural due process holdings described above) that there was no substantive due process bar to holding an insanity acquittee beyond the period for which he could have been incarcerated if convicted. We began by explaining the standard for our analysis: "The Due Process Clause 'requires that the nature

and duration of commitment bear some *reasonable* relation to the purpose for which the individual is committed.'" 463 U. S., at 368 (emphasis added) (quoting *Jackson, supra,* at 738). We then held that *"[i]n light of the congressional purposes underlying commitment of insanity acquittees* [in the District of Columbia,]" which we identified as treatment of the insanity acquittee's mental illness and protection of the acquittee and society, "petitioner clearly errs in contending that an acquittee's hypothetical maximum sentence provides the constitutional limit for his commitment." 463 U. S., at 368 (emphasis added). Given that the commitment law was reasonably related to Congress' purposes, this Court had no basis for invalidating it as a matter of substantive due process.

It is simply wrong for the Court to assert today that we "held" in *Jones* that "'the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous.'" *Ante,* at 77 (quoting *Jones,* 463 U. S., at 368).[14] We specifically noted in *Jones* that *no* issue regarding the standards for the release of insanity acquittees was before us. *Id.,* at 363, n. 11. The question we were answering in the part of *Jones* from which the Court quotes was whether it is permissible to hold an insanity acquittee for a period longer than he could have been incarcerated if convicted, *not* whether it is permissible to hold him once he becomes "sane." As noted above, our substantive due process analysis in *Jones* was straightforward: Did the means chosen by Congress (commitment of insanity acquittees until

---

[14] If this were really a "holding" of *Jones,* then I am at a loss to understand JUSTICE O'CONNOR's assertion that the Court today does *not* hold "that Louisiana may never confine dangerous insanity acquittees after they regain mental health." *Ante,* at 87. Either it is true that, as a matter of substantive due process, an insanity acquittee is "'entitled to release when he has recovered his sanity,'" *ante,* at 77 (quoting *Jones,* 463 U. S., at 368), or it is not. The Court apparently cannot make up its mind.

they have recovered their sanity or are no longer dangerous) reasonably fit Congress' ends (treatment of the acquittee's mental illness and protection, of society from his dangerousness)? [15]

In its arguments before this Court, Louisiana chose to place primary reliance on our decision in *United States* v. *Salerno*, 481 U. S. 739 (1987), in which we upheld provisions of the Bail Reform Act of 1984 that allowed *limited* pretrial detention of criminal suspects. That case, as the Court notes, *ante*, at 81–83, is readily distinguishable. Insanity acquittees, in sharp and obvious contrast to pretrial detainees, have *had* their day in court. Although they have not been convicted of crimes, neither have they been exonerated, as they would have been upon a determination of "not guilty" *simpliciter*. Insanity acquittees thus stand in a fundamentally different position from persons who have not been adjudicated to have committed criminal acts. That is what distinguishes this case (and what distinguished *Jones*) from *Salerno* and *Jackson* v. *Indiana, supra.* In *Jackson*, as in *Salerno*, the State had not proved beyond a reasonable doubt that the accused had committed criminal acts or otherwise was dangerous. See *Jones, supra,* at 364, n. 12. The Court disregards this critical distinction, and apparently deems applicable the same scrutiny to pretrial de-

---

[15] As may be apparent from the discussion in text, we have not been entirely precise as to the appropriate standard of review of legislation in this area. Some of our cases (*e. g., O'Connor* v. *Donaldson*, 422 U. S. 563 (1975)) have used the language of rationality review; others (*e. g., Jackson* v. *Indiana*, 406 U. S. 715 (1972)) have used the language of "reasonableness," which may imply a somewhat heightened standard; still others *(e. g., Jones)* have used the language of both rationality and reasonableness. What *is* clear from our cases is that the appropriate scrutiny is highly deferential, not strict. We need not decide in this case which precise standard is applicable, since the laws under attack here are at the very least reasonable.

tainees as to persons determined in a judicial proceeding to
have committed a criminal act.[16]

If the Court indeed means to suggest that *all* restrictions
on "freedom from bodily restraint" are subject to strict scru-
tiny, it has (at a minimum) wrought a revolution in the treat-
ment of the mentally ill. Civil commitment as we know it
would almost certainly be unconstitutional; only in the rarest
of circumstances will a State be able to show a "compelling
interest," and one that can be served in no other way, in
involuntarily institutionalizing a person. All procedures in-
volving the confinement of insanity acquittees and civil com-
mittees would require revamping to meet strict scrutiny.
Thus, to take one obvious example, the *automatic* commit-
ment of insanity acquittees that we expressly upheld in
*Jones* would be clearly unconstitutional, since it is inconceiv-
able that such commitment of persons who may well *pres-
ently* be sane and nondangerous could survive strict scrutiny.
(In *Jones*, of course, we applied no such scrutiny; we upheld
the practice not because it was justified by a compelling in-

---

[16] The Court asserts that the principles set forth in this dissent necessar-
ily apply not only to insanity acquittees, but also to convicted prisoners.
"JUSTICE THOMAS' rationale for continuing to hold the insanity acquittee
would surely justify treating the convicted felon in the same way, and if
put to it, it appears that he would permit it." *Ante*, at 83, n. 6. That is
obviously not so. If Foucha had been convicted of the crimes with which
he was charged and sentenced to the statutory maximum of 32 years in
prison, the State would not be entitled to extend his sentence at the end
of that period. To do so would obviously violate the prohibition on *ex post
facto* laws set forth in Art. I, § 10, cl. 1. But Foucha was not sentenced to
incarceration for any definite period of time; to the contrary, he pleaded
not guilty by reason of insanity and was ordered institutionalized *until he
was able to meet the conditions statutorily prescribed for his release.* To
acknowledge, as I do, that it is constitutionally permissible for a State
to provide for the continued confinement of an insanity acquittee who
remains dangerous is obviously quite different than to assert that the
State is allowed to confine *anyone* who is dangerous for as long as it
wishes.

terest, but because it was based on reasonable legislative inferences about continuing insanity and dangerousness.)

## 2

As explained above, the Court's opinion is profoundly ambiguous on the central question in this case: Must the State of Louisiana release Terry Foucha now that he has "regained" his sanity? In other words, is the defect in Louisiana's statutory scheme that it provides for the confinement of insanity acquittees who have recovered their sanity, or instead that it allows the State to confine sane insanity acquittees (1) indefinitely (2) in a mental facility? To the extent the Court suggests the former, I have already explained why it is wrong. I turn now to the latter possibility, which also is mistaken.

To begin with, I think it is somewhat misleading to describe Louisiana's scheme as providing for the "indefinite" commitment of insanity acquittees. As explained above, insanity acquittees are entitled to a release hearing every year at their request, and at any time at the request of a facility superintendent. Like the District of Columbia statute at issue in *Jones*, then, Louisiana's statute provides for "indefinite" commitment only to the extent that an acquittee is unable to satisfy the substantive standards for release. If the Constitution did not require a cap on the acquittee's confinement in *Jones*, why does it require one here? The Court and JUSTICE O'CONNOR have no basis for suggesting that either this Court or the society of which it is a part has recognized some general fundamental right to "freedom from indefinite commitment." If that were the case, of course, *Jones* would have involved strict scrutiny and is wrongly decided.

Furthermore, any concerns about "indefinite" commitment here are entirely hypothetical and speculative. Foucha has been confined for eight years. Had he been convicted of the crimes with which he was charged, he could have been incar-

cerated for 32 years. See La. Rev. Stat. Ann. §§ 14:60, 14:94 (West 1986). Thus, I find quite odd JUSTICE O'CONNOR's suggestion, *ante*, at 89, that this case might be different had Louisiana, like the State of Washington, limited confinement to the period for which a defendant might have been imprisoned if convicted. Foucha, of course, would be in precisely the same position today—and for the next 24 years—had the Louisiana statute included such a cap. Thus, the Court apparently finds fault with the Louisiana statute *not* because it has been applied to Foucha in an unconstitutional manner, but because the Court can imagine it being applied to *someone else* in an unconstitutional manner. That goes against the first principles of our jurisprudence. See, *e. g., Salerno,* 481 U. S., at 745 ("The fact that [a detention statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment").[17]

Finally, I see no basis for holding that the Due Process Clause *per se* prohibits a State from continuing to confine in a "mental institution"—the federal constitutional definition of which remains unclear—an insanity acquittee who has recovered his sanity. As noted above, many States have long provided for the continued detention of insanity acquittees who remain dangerous. Neither Foucha nor the Court present any evidence that these States have traditionally transferred such persons from mental institutions to other detention facilities. Therefore, there is simply no basis for this Court to recognize a "fundamental right" for a sane insanity acquittee to be transferred out of a mental facility. "In an attempt to limit and guide interpretation of the [Due Process] Clause, we have insisted not merely that the interest

---

[17] I fully agree with JUSTICE O'CONNOR, *ante*, at 88, that there would be a serious question of rationality had Louisiana sought to institutionalize a sane insanity acquittee for a period longer than he might have been imprisoned if convicted. But that is simply not the case here.

denominated as a 'liberty' be 'fundamental' (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society." *Michael H.* v. *Gerald D.*, 491 U. S. 110, 122 (1989) (plurality opinion).

Removing sane insanity acquittees from mental institutions may make eminent sense as a policy matter, but the Due Process Clause does not require the States to conform to the policy preferences of federal judges. "The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Bowers*, 478 U. S., at 194. I have no idea what facilities the Court or JUSTICE O'CONNOR believe the Due Process Clause mandates for the confinement of sane-but-dangerous insanity acquittees. Presumably prisons will not do, since imprisonment is generally regarded as "punishment." May a State designate a wing of a mental institution or prison for sane insanity acquittees? May a State mix them with other detainees? Neither the Constitution nor our society's traditions provide any answer to these questions.[18]

### 3

"So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin* v. *California*, 342 U. S. 165, 172 (1952), or interferes

---

[18] *In particular circumstances*, of course, it may be unconstitutional for a State to confine in a mental institution a person who is no longer insane. This would be a different case had Foucha challenged specific conditions of confinement—for instance, being forced to share a cell with an insane person, or being involuntarily treated after recovering his sanity. But Foucha has alleged nothing of the sort—all we know is that the State continues to confine him in a place called the Feliciana Forensic Facility. It is by no means clear that such confinement is *invariably* worse than, for example, confinement in a jail or other detention center—for all we know, an institution may provide a quieter, less violent atmosphere. I do not mean to suggest that that is the case—my point is only that the issue cannot be resolved in the abstract.

126

with rights 'implicit in the concept of ordered liberty,' *Palko* v. *Connecticut*, 302 U. S. 319, 325–326 (1937)." *Salerno, supra*, at 746. The legislative scheme the Court invalidates today is, at the very least, substantively reasonable. With all due respect, I do not remotely think it can be said that the laws in question "offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934). Therefore, in my view, this Court is not entitled, as a matter of substantive due process, to strike them down.

I respectfully dissent.