452 F.3d 186
 ERNST J., Petitioner-Appellant,
v.
James L. STONE, Commissioner, New York State Office of Mental Health, Richard Bennett, Executive Director, Mid-Hudson Forensic Psychiatric Center, Respondents-Appellees.
 Docket No. 05-2754-PR.
 United States Court of Appeals, Second Circuit.
 Argued: January 11, 2006.
 Decided: June 21, 2006.
 
 Lisa Volpe (Sidney Hirschfeld, Director, Mental Hygiene Legal Service, Dennis B. Feld, on the brief), Mental Hygiene Legal Service, Second Judicial Department, Mineola, NY, for Petitioner-Appellant.
 Caroline R. Donhauser, Assistant District Attorney (Charles J. Hynes, District Attorney of Kings County, Leonard Joblove and Victor Barall, Assistant District Attorneys, on the brief), Office of the District Attorney of Kings County, Brooklyn, NY, for Respondents-Appellees.
 Jeffrey P. Metzler, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Robert H. Easton, Deputy Solicitor General, on the brief), Office of the Attorney General of the State of New York, New York, NY, for Respondents-Appellees.
 Before WINTER, CABRANES, and SACK, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 In New York State, once a criminal defendant pleads not responsible by reason of mental disease or defect ("NRRMDD"), the state has several options: it may commit him to a secure psychiatric facility, commit him to a non-secure psychiatric facility, release him subject to an "order of conditions," or in rare circumstances, discharge him unconditionally. Those defendants who are initially released subject to an order of conditions may, if their condition deteriorates, be "recommitted" involuntarily to a secure psychiatric facility upon a finding—by a preponderance of the evidence—that they have developed a "dangerous mental disorder."
 
 
 2
 We consider here whether, in recommitment proceedings for NRRMDD defendants who were initially released subject to an order of conditions, the application of the "preponderance of the evidence" standard, instead of the "clear and convincing evidence" standard normally required for the involuntary commitment of a person to a psychiatric facility, violates either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment.
 
 
 3
 Petitioner-appellant Ernst J. ("petitioner") argues that because—at a hearing immediately following his NRRMDD plea—he was released subject to an order of conditions rather than committed to a psychiatric facility, he successfully rebutted the presumption of mental illness and danger to the community that arose when he entered his plea. He asserts that he was therefore entitled to the same procedural protections accorded to those persons whom the state seeks to commit to psychiatric facilities without any showing or admission of criminal conduct—including the constitutional requirement that the state demonstrate by clear and convincing evidence that he suffered from a dangerous mental disorder when he was recommitted. Accordingly, petitioner contends that New York Criminal Procedure Law ("CPL") § 330.20(14),[1] as interpreted by New York courts, improperly permits NRRMDD defendants such as himself to be recommitted by a mere preponderance-of-the-evidence standard and thereby violates the Due Process or Equal Protection Clause of the Fourteenth Amendment.
 
 
 4
 Respondents-appellees assert that because petitioner is an NRRMDD defendant who was discharged into outpatient care subject to an order of conditions, he remains a member of a special class who— at least until the expiration of that order— may legitimately be subjected to recommitment proceedings in which the state is required only to satisfy a lesser standard of proof than that required for civil commitment.
 
 
 5
 Because this case comes to us on review of a petition for habeas corpus, which is governed by the deferential standard of review prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214, 1219 (1996), codified at 28 U.S.C. § 2254(d)(1), the scope of our inquiry is limited to determining whether the United States District Court for the Eastern District of New York (Raymond J. Dearie, Judge) correctly concluded that the New York Supreme Court, Appellate Division, Second Department ("Appellate Division") did not act contrary to or unreasonably apply "clearly established Federal law" when it rejected petitioner's constitutional challenge. See Ernst J. v. Stone, 372 F.Supp.2d 330 (E.D.N.Y.2005). In Francis S. v. Stone, 221 F.3d 100 (2d Cir.2000), a case that raised substantially similar issues, we recognized the same limitations on our review, emphasizing that we were not authorized to consider "[a]s an initial question of federal constitutional law, unconstrained by [28 U.S.C.] 2254(d)(1)," whether CPL § 330.20(14) violates the Fourteenth Amendment. Id. at 113.
 
 
 6
 Because we cannot say that it was objectively unreasonable for the Appellate Division to conclude, in light of clearly established federal law as enunciated by the Supreme Court of the United States, that NRRMDD defendants are "an exceptional class of individuals who may properly be treated somewhat differently from persons subject to civil commitment" and that "[t]he recommitment provisions of CPL § 330.20(14) have a direct and substantial relationship with the State's interest in protecting the public safety, safeguarding the rights of insanity acquittees, and providing treatment for those acquittees who suffer from a mental illness," see In re Ernst J., 292 A.D.2d 528, 739 N.Y.S.2d 737, 738 (2d Dep't 2002) (internal quotation marks omitted), we affirm the District Court's denial of petitioner's application for a writ of habeas corpus.
 
 BACKGROUND
 I. New York's Statutory Scheme
 
 7
 New York law "distinguish[es] between the procedures to be followed for the involuntary civil commitment of persons suffering from mental illness and the procedures that apply to persons charged with a crime and determined, by a plea or a verdict, to be [NRRMDD]." Francis S., 221 F.3d at 101. "Involuntary civil commitment procedures mandate numerous protections, including a requirement that the party proposing confinement must prove by clear and convincing evidence that the person is mentally ill and poses a danger to himself or others." Id. (citing In re John P., 265 A.D.2d 559, 697 N.Y.S.2d 120, 121 (2d Dep't 1999)). By contrast, for defendants who have successfully entered a plea of NRRMDD in accordance with CPL § 220.15,[2] the New York Supreme Court orders a psychiatric examination "to determine the defendant's current mental condition, see CPL § 330.20(2)-(5), and then holds a hearing as to the appropriate disposition, see id. § 330.20(6)." Id.
 
 
 8
 Based on its findings at this hearing, the New York Supreme Court must then place the defendant in one of three categories, or "tracks." If the defendant is determined, by a preponderance of the evidence, to suffer from a "dangerous mental disorder," as that term is defined under New York law,[3] he must be committed to a secure psychiatric facility. See CPL § 330.20(6) (requiring, upon a showing "to the satisfaction of the court that the defendant has a dangerous mental disorder" that the court "must issue a commitment order"), and (1)(f) (describing commitment to a "secure facility"); People v. Escobar, 61 N.Y.2d 431, 439-40, 474 N.Y.S.2d 453, 462 N.E.2d 1171 (1984) (interpreting the phrase "to the satisfaction of the court" to refer to a burden of proof "by a preponderance of the evidence"). Defendants in this position are colloquially referred to as "track one" defendants.
 
 
 9
 If the NRRMDD defendant is determined not to be suffering from a "dangerous mental disorder," but nonetheless to be "mentally ill," as that term is defined under New York law,[4] he is remanded to the custody of the State Commissioner of Mental Health (the "Commissioner") subject to an "order of conditions"[5] authorized by the CPL, but his commitment is then governed by the civil commitment provisions of New York Mental Hygiene Law ("MHL"). See CPL § 330.20(7). Notably, "the CPL's definition of `mentally ill' includes only a subset of those suffering from a `mental illness' as defined by the mental hygiene law—those whose mental illness requires in-patient treatment." Francis S., 221 F.3d at 101-02 n. 3; see note 4, ante. These NRRMDD defendants, who, in the court's view, require inpatient treatment for their mental illness but who do not suffer from a "dangerous mental disorder," are referred to as "track two" defendants.
 
 
 10
 Finally, NRRMDD defendants who are adjudged by the court to be neither "mentally ill" nor suffering from a "dangerous mental disorder" are referred to as "track three" defendants. Such defendants must be either discharged unconditionally or discharged subject to an order of conditions, which generally requires them to enroll in out-patient psychiatric treatment. See CPL § 330.20(7); see also note 5, ante. Where the defendant is discharged subject to an order of conditions, the order is valid for five years, and "for good cause shown" may be extended for an additional five years. See CPL § 330.20(1)(o).
 
 
 11
 New York law anticipates the possibility that a "track two" NRRMDD defendant or a "track three" NRRMDD defendant who is initially discharged subject to an order of conditions may suffer a severe setback during the course of out-patient care and develop a dangerous mental disorder that requires his hospitalization in a secure psychiatric facility. Accordingly, the CPL provides that "[w]ith respect to an NRRMDD defendant [who is] subject to an order of conditions, whether or not released from a mental health facility, the commissioner of mental [health] or the district attorney may apply to the court that issued the order for a recommitment order when the applicant believes that the defendant has a dangerous mental disorder." Francis S., 221 F.3d at 102 (citing CPL § 330.20(14)). "At a hearing the applicant must establish `to the satisfaction of the court' that the defendant has a dangerous mental disorder, in which event the court orders recommitment." Id. (quoting CPL § 330.20(14)).[6]
 
 
 12
 II. Petitioner's Mental Condition and Litigation History
 
 
 13
 Because the relevant facts in this case are not disputed, and because this appeal turns on a pure question of law, we set forth only those facts necessary to clarify the nature of the issues presented.
 
 
 14
 Petitioner suffers from chronic schizophrenia and has a history of violent criminal activity resulting from his condition. On February 27, 1992, while experiencing a psychotic episode during which he apparently heard voices and mistook an elderly man for the devil, petitioner attacked the man, leaving him with serious bite wounds to the hand and genitals. These injuries required the victim to spend five days in the hospital, where doctors partially amputated one of his fingers and closed up his open wounds with stitches. See Ernst J., 372 F.Supp.2d at 331-32. For this attack, petitioner was charged with assault in the first degree, assault in the second degree, and burglary in the second degree. Id. at 332. On April 7, 1993, in accordance with CPL § 220.15, the New York Supreme Court, King's County ("New York Supreme Court") accepted petitioner's plea of NRRMDD to assault in the second degree. Id.
 
 
 15
 In June 1993, after petitioner entered his plea of NRRMDD, he was examined by psychiatrists pursuant to an order of the New York Supreme Court. See CPL § 330.20(2).[7] The psychiatrists concluded that although petitioner suffered from schizophrenia, he was not, at the time of their examination, suffering from a "dangerous mental disorder," nor was he "mentally ill," as defined under New York law. The psychiatrists did not give petitioner a clean bill of health, however. Rather, they advised the New York Supreme Court that petitioner required psychiatric treatment that could safely be provided in an outpatient setting. See Ernst J., 372 F.Supp.2d at 333.
 
 
 16
 After an initial commitment hearing on June 1, 1994, the New York Supreme Court determined, consistent with the conclusions of the examining psychiatrists described above, that petitioner was not suffering from a "dangerous mental disorder" and was not "mentally ill"—in other words, it designated him a "track three" NRRMDD defendant. Accordingly, petitioner was committed to neither a secure nor a non-secure inpatient facility; rather, the New York Supreme Court ordered that he be discharged, subject to a five-year order of conditions set to expire on June 1, 1999. Among the conditions imposed, petitioner was required to remain in outpatient treatment five days a week for his ongoing mental illness. Id.
 
 
 17
 On October 22, 1996, petitioner was arrested for criminal trespass and harassment. He pleaded guilty to harassment in the second degree and was ultimately sentenced to conditional discharge. In 1997, petitioner was again arrested for criminal trespass, although he was not prosecuted for that offense. Following each arrest, he was admitted to Brookdale Hospital for inpatient psychiatric care.
 
 
 18
 Immediately prior to the expiration of his order of conditions, petitioner's mental condition dramatically deteriorated, and he began exhibiting increasingly violent behavior. On May 24, 1999, while living in a residential treatment center, petitioner took a female social worker hostage and threatened to sexually assault her. In the aftermath of this incident, petitioner was transferred to the custody of Interfaith Hospital on an emergency basis "for a period not to exceed fifteen days pursuant to Mental Hygiene Law § 9.39." Id. Soon thereafter, the Commissioner sought an extension of petitioner's order of conditions, and petitioner's involuntary confinement at Interfaith Hospital was extended. Id. at 333-34.
 
 
 19
 On July 13, 1999, petitioner was transferred to Kingsboro Psychiatric Center ("Kingsboro"), where he attacked and intimidated other patients repeatedly. At Kingsboro's request and following a hearing, the New York Supreme Court "ordered a three-month period of retention upon clear and convincing evidence that petitioner was mentally ill and posed a substantial threat of physical harm to himself or others. In addition, with the consent of all parties, the court extended the CPL § 330.20 order of conditions for a period of three years." Id. at 334.
 
 
 20
 By October 1999, clinicians at Kingsboro were convinced that petitioner had developed a "dangerous mental disorder," and they asked the Commissioner to seek an order recommitting him to a secure psychiatric facility pursuant to CPL § 330.20(14). See CPL § 330.20(14) ("At any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court ... for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder.") (emphasis added).[8] Petitioner moved to dismiss the application for recommitment, arguing that the Fourteenth Amendment of the United States Constitution prohibited New York from recommitting him pursuant to the lower evidentiary standard of "preponderance of the evidence," rather than the "clear and convincing evidence" standard which governs the recommitment of persons held under civil commitment procedures.
 
 
 21
 On February 9, 2000, the New York Supreme Court denied petitioner's motion to dismiss the recommitment application. Then, over the course of several days, beginning on May 17, 2000 and concluding on July 12, 2000, the New York Supreme Court held a hearing to consider the merits of the Commissioner's recommitment application. After considering testimony from mental health professionals and from petitioner, the court found by a preponderance of the evidence that petitioner suffered from a dangerous mental disorder, and thus granted the Commissioner's application. By order dated July 12, 2000, petitioner was recommitted to a secure psychiatric facility. See Ernst J., 372 F.Supp.2d at 334.
 
 
 22
 Petitioner appealed to the Appellate Division, which affirmed the recommitment order on March 18, 2002, after concluding that
 
 
 23
 [d]efendants who are not [responsible] by reason of mental disease or defect are "an exceptional class of individuals who may properly be treated somewhat differently from persons subject to civil commitment." The recommitment provisions of CPL 330.20(14) have a direct and substantial relationship with the State's interest in protecting the public safety, safeguarding the rights of insanity acquittees, and providing treatment for those acquittees who suffer from a mental illness.
 
 
 24
 In re Ernst J., 292 A.D.2d 528, 739 N.Y.S.2d 737, 738 (2d Dep't 2002) (internal citations omitted). Petitioner appealed from the Appellate Division's decision as of right to the New York Court of Appeals, but the Court of Appeals dismissed the appeal on June 11, 2002. See In re Ernst J., 98 N.Y.2d 670, 746 N.Y.S.2d 458, 774 N.E.2d 223 (2002). Petitioner's subsequent motion for leave to appeal from the Appellate Division's decision was denied by the Court of Appeals on October 15, 2002. In re Ernst J., 98 N.Y.2d 614, 751 N.Y.S.2d 169, 780 N.E.2d 980 (2002); see Ernst J., 372 F.Supp.2d at 334-35.
 
 
 25
 On June 2, 2003, petitioner brought the pending habeas corpus petition in the District Court, raising the same Fourteenth Amendment challenges to New York's recommitment procedure that he had raised in state court. In an order dated May 18, 2005, the District Court denied the petition. In a Memorandum of Decision dated May 31, 2005, the District Court set forth the basis for its conclusion that the state courts had not unreasonably applied clearly established federal law in dismissing petitioner's constitutional challenge to CPL § 330.20(14). After the reviewing the applicable precedents of the United States Supreme Court, the District Court held that "[a]n initial hearing determination that an NRRMDD defendant does not require inpatient treatment and can be discharged subject to an order of conditions does not destroy the basis for affording the defendant different procedural protections than those afforded to a [person who has been civilly committed]." Id. at 336-37. Instead, the District Court elaborated, "the fact that a NRRMDD defendant... is discharged subject to an order of conditions rather than unconditionally indicates that the court has concluded that defendant's compliance with a prescribed treatment plan is necessary to assure the safety of the public and the defendant himself." Id. at 337. Ultimately, the District Court concluded that the outcome in petitioner's case was controlled by our holding in Francis S., where we rejected, on habeas review, a constitutional challenge "relate[d] to recommitment after [a `track two' defendant's] discharge to outpatient treatment under an order of conditions." Id. at 339.
 
 
 26
 After denying the petition, the District Court granted petitioner a certificate of appealability. This timely appeal followed.
 
 DISCUSSION
 I. Standard of review
 
 27
 Where, as here, a petitioner seeks a writ of habeas corpus, Congress has specified that a reviewing court shall not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Petitioner contends that while the Appellate Division's judgment was not "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," it nonetheless "involved an unreasonable application of[ ] clearly established Federal law," 28 U.S.C. § 2254(d)(1), because it identified the correct governing legal principle from the Supreme Court's decisions but "unreasonably refuse[d] to extend that principle to a new context where it should apply," Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (construing 28 U.S.C. § 2254(d)(1)).
 
 
 28
 Because petitioner's challenge presents a mixed question of law and fact, we review the District Court's conclusions de novo. See, e.g., Pham v. United States, 317 F.3d 178, 182 (2d Cir.2003) (stating that mixed questions of law and fact presented in a habeas corpus petition are reviewed de novo). We employ a standard of "objective reasonableness" when reviewing a state court's interpretation of federal law, which includes our evaluation of whether a state court unreasonably refused to extend a governing legal principle to a new context where it should apply. See Kennaugh v. Miller, 289 F.3d 36, 45-46 & n. 2 (2d Cir.2002). Mindful of the Supreme Court's guidance that "an unreasonable application of federal law is different from an incorrect application of federal law," Williams, 529 U.S. at 410, 120 S.Ct. 1495, we have held that "[s]ome increment of incorrectness beyond error is required" before habeas relief will be permitted, see, e.g., Francis S., 221 F.3d at 111. At the same time, however, we cautioned that "the increment need not be great" because "otherwise, habeas relief would be limited to state court decisions `so far off the mark as to suggest judicial incompetence.'" Id. (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 889 (3d Cir.1999) (en banc)).
 
 
 29
 We underscore that "the phrase `clearly established Federal law, as determined by the Supreme Court of the United States[,]'... refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412, 120 S.Ct. 1495.
 
 II. Petitioner's Fourteenth Amendment Claims
 
 30
 Petitioner's constitutional challenge to the application of CPL § 330.20(14) in his case centers around his claim that the New York Supreme Court's determination, at the initial commitment hearing on June 1, 1994, that he was neither "mentally ill" nor suffering from a "dangerous mental disorder" rebutted the presumptions of mental illness and dangerousness that flowed from the entry of his NRRMDD plea, thereby extinguishing any basis for subjecting him to a lower standard of proof in a subsequent recommitment proceeding. Petitioner's argument is styled alternatively as a procedural due process claim and an equal protection claim. The due process claim alleges that before New York may recommit a "track three" NRRMDD defendant such as petitioner to a secure psychiatric facility, it is required to demonstrate by clear and convincing evidence (the evidentiary standard applicable to persons who are civilly committed), rather than by a mere preponderance of the evidence, that he is "mentally ill" and suffering from a "dangerous mental disorder." The equal protection claim asserts that New York has no important governmental interest in applying different evidentiary standards for the recommitment of "track three" NRRMDD defendants on the one hand, and civil patients who were once found to be dangerously mentally ill on the other.
 
 A. Due Process Claim
 
 31
 Petitioner contends that the state courts unreasonably refused to extend the principles underpinning the Supreme Court's holdings in Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), and Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), to require a clear and convincing evidence standard for the recommitment of "track three" NRRMDD defendants such as himself.
 
 
 32
 In Addington v. Texas, the Supreme Court considered "what standard of proof is required by the Fourteenth Amendment to the Constitution in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital." Addington, 441 U.S. at 419-20, 99 S.Ct. 1804. After balancing "the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed," id. at 425, 99 S.Ct. 1804, and taking into account the need to "minimize the risk of erroneous decisions," id., the Supreme Court concluded that, in civil commitment proceedings, states must prove the elements of mental illness and dangerousness by no less than "clear and convincing" evidence, id. at 432-33, 99 S.Ct. 1804.
 
 
 33
 In Jones v. United States, the Supreme Court considered whether a criminal defendant who was acquitted by reason of insanity may be automatically committed to a mental hospital and released only after showing by a preponderance of the evidence that he was no longer mentally ill or dangerous. Jones, 463 U.S. at 366-67, 103 S.Ct. 3043. The Jones Court began by noting that "[a] verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." Id. at 363, 103 S.Ct. 3043. The Court then rejected Jones's contention "that his indefinite commitment [was] unconstitutional because the proof of his insanity was based only on a preponderance of the evidence, as compared to Addington's civil-commitment requirement of proof by clear and convincing evidence." Id. at 366-67, 103 S.Ct. 3043. The Court explained that Jones's argument "ignore[d] important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." Id. at 367, 103 S.Ct. 3043. In particular, the Court emphasized that because the insanity acquittee "himself advances insanity as a defense and proves that his criminal act was a product of his mental illness" and because "the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere `idiosyncratic behavior,'" "the concerns critical to [its] decision in Addington are diminished or absent in the case of insanity acquittees." Id.
 
 
 34
 Importantly, for present purposes, the Supreme Court's holding in Jones concerned only the initial confinement of insanity acquittees, and did not address the standard of proof applicable to recommitment or release procedures. See Jones, 463 U.S. at 370, 103 S.Ct. 3043 (holding that "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government ... to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society"). In fact, the Jones Court specifically declined to address the constitutionality of the District of Columbia's provisions governing the release of insanity acquittees and civilly-committed persons, "as petitioner... challenged neither the adequacy of the release standards generally nor the disparity in treatment of insanity acquittees and other committed persons." Id. at 363 n. 11, 103 S.Ct. 3043.
 
 
 35
 In Foucha v. Louisiana, the Supreme Court reaffirmed its holding in Jones but clarified that a state may not, consistent with the Fourteenth Amendment, continue to confine in a psychiatric facility an insanity acquittee who remains dangerous but who no longer suffers from any mental illness. Specifically, the Court held that because "Louisiana [did] not contend that Foucha was mentally ill at the time of the trial court's hearing[,]" "the basis for holding [him] in a psychiatric facility as an insanity acquittee has disappeared." Foucha, 504 U.S. at 78, 112 S.Ct. 1780. The Foucha Court further stated that "even if his continued confinement were constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." Id.
 
 
 36
 Seizing upon this last statement in Foucha and upon the statement in Jones that an insanity acquittee may be confined "until such time as he has regained his sanity or is no longer a danger to himself or society," petitioner insists that the Supreme Court's holdings, when read together, dictate that
 
 
 37
 although the lesser standard of proof is appropriate in the first instance because of the presumption which arises from the not responsible plea or verdict (the continuance of mental illness and dangerousness), at the point when that original basis for holding the individual in a psychiatric facility as an insanity acquittee has disappeared (because he is either not mentally ill or not dangerous),.... the civil standard of clear and convincing evidence must be applied to justify further retention.
 
 
 38
 Br. of Pet'r at 23-24. Petitioner further argues that the District Court erroneously assumed "that the existence of an order of conditions is relevant to the question of what standard of proof should be applied upon recommitment." Id. at 23.
 
 
 39
 Neither the Supreme Court's holding in Jones nor its holding in Foucha directly addresses the circumstances of this case. In Jones, the Court considered the constitutionality of initial commitment procedures for insanity acquittees, carving out an exception to the general rule articulated in Addington that in all civil commitments the state must demonstrate a dangerous mental illness by clear and convincing evidence. The Jones Court did not, however, rule on whether the different circumstances that permit the use of a preponderance-of-the-evidence standard in the initial commitment of insanity acquittees continue to warrant the use of a lower standard of proof in the recommitment of acquittees who have been discharged into outpatient care and remain subject to a valid order of conditions. Foucha is also not directly on point because it held "only that civil commitment procedures are required for an insanity acquittee who is no longer mentally ill." Francis S., 221 F.3d at 113. Although petitioner was adjudged at his initial commitment hearing not to be "mentally ill" as defined by New York state law, see note 4, ante, in the limited sense that he did not then require inpatient psychiatric treatment, it is not disputed that (1) the New York Supreme Court ordered him at the initial hearing to continue psychiatric treatment and (2) since the time of his NRRMDD plea, he has continuously suffered from mental illness to a degree requiring frequent treatment on an outpatient basis.
 
 
 40
 In deciding that the Appellate Division did not act unreasonably in declining to extend the Supreme Court's holdings in Jones and Foucha to invalidate the application of CPL § 330.20(14) in petitioner's case, the District Court reasoned that the state's use of a preponderance-of-the-evidence standard in recommitment proceedings for "track three" defendants comports with the due process requirement "that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." See Ernst J., 372 F.Supp.2d at 337-38 (quoting Jones, 463 U.S. at 368, 103 S.Ct. 3043). The District Court determined that Jones "supports [the] judgment" of the New York legislature that so long as an NRRMDD defendant remains subject to an order of conditions, he may be recommitted by a lower standard of proof because "having concededly once engaged in criminal conduct as a result of mental illness, the insanity acquittee continues to present a serious risk of recurrence of dangerous behavior derived from mental illness." Id. at 337 (internal quotation marks omitted).
 
 
 41
 In Francis S. v. Stone, 221 F.3d 100 (2d Cir.2000), we considered whether New York's recommitment of "track two" NRRMDD defendants subject to a mere preponderance-of-the evidence standard violates the Due Process Clause of the Fourteenth Amendment. In that case— which also arose on habeas review—an NRRMDD defendant ("Francis S.") raised nearly identical constitutional arguments to those presented in this appeal, with the principal distinction being that Francis S. was initially designated a "track two," rather than a "track three," defendant. After entering a plea of NRRMDD, Francis S. was found by the state court to be "mentally ill" but not suffering from a "dangerous mental disorder." Id. at 102-03. Accordingly, Francis S. was committed to an inpatient psychiatric program for four months before being discharged, subject to an order of conditions. Id. at 103. When Francis S. failed to comply with the treatment plan prescribed in his order of conditions, the state attempted to recommit him to a secure institution, but the New York Supreme Court denied this application after finding that the state had failed to prove by a preponderance of the evidence that Francis S. suffered from a dangerous mental disorder. Instead, the New York Supreme Court remanded Francis S. to the Commissioner for inpatient treatment in a non-secure facility. Id.
 
 
 42
 Following this second round of inpatient treatment, Francis S. was again discharged subject to an order of conditions, and again he failed to comply with his treatment regimen. Soon thereafter, the state reapplied for a recommitment order under § 330.20(14), see note 1, ante, and this time, the state's application was denied by the New York Supreme Court but granted by the Appellate Division. Id. at 104-05. Francis S. was involuntarily recommitted to a secure facility, at which point he brought suit alleging that New York's recommitment procedures were unconstitutional. In short, Francis S. argued that the state court's post-acquittal determination that he lacked a dangerous mental disorder restored him to the status of a normal citizen, such that if the state wanted him committed, it would have to comply with the more stringent procedures set forth in Addington.
 
 
 43
 After weighing this argument—and after carefully evaluating the specific language in Jones and Foucha that undergirded Francis S.'s claim—we recognized that it is "a close question whether the adjudications that Francis did not suffer from a dangerous mental disorder in 1987 and 1990 obliged New York to use the normal civil commitment procedures to recommit him thereafter." Id. at 113. We further indicated that had the matter been presented to us "[a]s an initial question of federal constitutional law, unconstrained by section 2254(d)(1), we might well rule that [a constitutional] violation has been shown." Id.[9] Ultimately, however, in light of the standard of review prescribed by AEDPA, we affirmed the district court's denial of the petition for a writ of habeas corpus on the basis that "[n]o clearly established federal law, as enunciated by the Supreme Court, required [Francis S.'s] claim to be upheld." Id. Thus, despite suggesting that the New York Court of Appeals could have erred in interpreting the requirements of the Fourteenth Amendment, we nonetheless held that the state court's interpretation of clearly established Supreme Court precedent was entitled to deference insofar as it was not "objectively unreasonable." Id.
 
 
 44
 Petitioner now argues that his case "is distinguishable [from Francis S.] because his release occurred at the initial commitment stage, thus rebutting at the earliest instance the presumption which flowed from his insanity acquittal." Br. of Pet'r at 27 (emphasis added). Yet petitioner overstates the degree to which his case may be distinguished from the facts in Francis S. Francis S. was, at the time of the challenged recommitment order, in a position equivalent to that of a "track three," rather than a "track two," defendant. Although it is true that Francis S. was originally classified as a "track-two" defendant, he was discharged from inpatient care subject to an order of conditions just four months after his initial classification. See Francis S., 221 F.3d at 103. Petitioner provides no compelling explanation of why an NRRMDD's original status, rather than his status at the time of the state's recommitment application, is salient for constitutional purposes. In other words, petitioner fails to explain why the mere fact that Francis S. passed through four months of inpatient care before receiving his conditional release—as opposed to Ernst J., who was immediately released into outpatient care subject to an order of conditions—distinguishes Francis S. from this case.
 
 
 45
 Moreover, at the time when the state sought to recommit Francis S., he was undergoing outpatient treatment and was just three days from reaching the expiration of his order of conditions. Id. at 104. By contrast, petitioner in the instant case was, at the time of his recommitment hearing, under the inpatient supervision of a hospital that could no longer handle his violent behavior and which requested that he be transferred to a secure psychiatric facility. In these circumstances, it would be a bizarre outcome, to say the least, for petitioner to succeed in securing habeas relief where Francis S. failed simply because five years earlier—and at the "earliest instance" possible—petitioner had been diagnosed as not having been in need of inpatient care.
 
 
 46
 Because petitioner fails to explain why the differences he identifies between this case and the facts in Francis S. should carry constitutional significance — or more precisely, why it would be objectively unreasonable for a state court to read existing Supreme Court precedents to conclude that no such difference exists—we must deny his due process claim.
 
 
 47
 In reaching this result, we emphasize that we are doubly constrained in evaluating the merits of petitioner's claim. In addition to being required to abide by the terms of AEDPA, which prescribes a limited standard of review in habeas appeals, we are required to adhere to our previous ruling in Francis S., which adjudicated claims materially indistinguishable from those raised by petitioner in the instant case.
 
 B. Equal Protection Claim
 
 48
 In addition to his due process claim, petitioner brings an equal protection challenge to the application of CPL § 330.20(14). In short, he argues that New York may not, consistent with the Fourteenth Amendment of the Constitution, prescribe one evidentiary standard for the recommitment of civil patients while maintaining another, lower standard for the recommitment of NRRMDD defendants.
 
 
 49
 The Supreme Court in Jones declined to address separately the equal protection claims raised in that case on the ground that "[b]oth petitioner and the Government acknowledge that th[e] equal protection argument essentially duplicates petitioner's due process argument." Jones, 463 U.S. at 362 n. 10, 103 S.Ct. 3043. The Court reasoned that "if the Due Process Clause does not require that an insanity acquittee be given the particular procedural safeguards provided in a civil-commitment hearing under Addington, then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees." Id. When it determined that Jones's equal protection argument was subsumed within his due process claim, the Supreme Court was operating with the understanding—as was appropriate in light of the facts in Jones—that the relevant comparison for equal protection purposes was between the standards used to commit insanity acquittees and those used to commit ordinary persons who are alleged to be suffering from dangerous mental illnesses but have not been accused of committing any crimes.
 
 
 50
 Here, by contrast, we consider the application of different evidentiary standards in recommitment—rather than initial commitment—proceedings, where the relevant comparison is between insanity acquittees who have undergone continuing inpatient or outpatient care and civil patients who have already been committed to a secure facility on the basis of a finding that they suffered from a dangerous mental illness. In the circumstances presented, our analysis requires us to go beyond our determination that the Appellate Division did not act unreasonably in concluding that New York's recommitment procedure for NRRMDD defendants is consistent with the Due Process Clause, as construed by the Supreme Court in Addington and Jones. Rather, we must also address the analytically separate question of whether it is constitutionally permissible for New York to, in effect, disfavor insanity acquittees relative to those who have been confined in psychiatric facilities pursuant to the civil commitment process.
 
 
 51
 New York law specifies that persons who have been civilly committed may be released subject to an order of conditions—much as "track three" NRRMDD defendants may be released conditionally rather than discharged. See MHL § 29.15(a) ("A patient may be discharged or conditionally released to the community by the director of a department facility, if, in the opinion of staff familiar with the patient's case history, such patient does not require active in-patient care and treatment."). The statute governing civilly-committed persons also contains the following recommitment provision:
 
 
 52
 [T]he director may terminate the conditional release and order the patient to return to the facility at any time during the period for which retention was authorized, if, in the director's judgment, the patient needs in-patient care and treatment and the conditional release is no longer appropriate; provided, however, that in any such case, the director shall cause written notice of such patient's return to be given to the mental hygiene legal service. The director shall cause the patient to be retained for observation, care and treatment and further examination in a hospital for up to seventy-two hours if a physician on the staff of the hospital determines that such person may have a mental illness and may be in need of involuntary care and treatment in a hospital pursuant to the provisions of [MHL art. 9]. Any continued retention in such hospital beyond the initial seventy-two hour period shall be in accordance with the provisions of this chapter relating to the involuntary admission and retention of a person.
 
 
 53
 MHL § 29.15(e) (emphasis added). In other words, if the state wants to hold for more than seventy-two hours a civilly-committed patient whose conditional release was terminated, it must again establish a need for the recommitment by clear and convincing evidence. See MHL § 9.33 (describing procedures for the involuntary retention of civil patients); see also Anonymous v. Carmichael, 284 A.D.2d 182, 727 N.Y.S.2d 408 (1st Dep't 2001) ("In order for a hospital to retain a patient for involuntary psychiatric care under New York law, the hospital must establish, `by clear and convincing evidence, that the patient is mentally ill and in need of continued, supervised care and treatment, and that the patient poses a substantial threat of physical harm to himself and/or others[.]'" (quoting Ford v. Daniel R., 215 A.D.2d 294, 626 N.Y.S.2d 784, 786 (1st Dep't. 1995))). By contrast, the CPL provides that the state may indefinitely renew an order of conditions imposed upon an insanity acquittee, such that, in theory at least, it could always retain the possibility of recommitting that acquittee without ever having to satisfy the clear and convincing evidence standard. See In re Oswald N., 87 N.Y.2d 98, 100, 637 N.Y.S.2d 949, 661 N.E.2d 679 (1995).
 
 
 54
 At the outset, we note that the Appellate Division correctly applied an intermediate level of scrutiny when evaluating petitioner's claim.[10] See In re Ernst J., 739 N.Y.S.2d at 738 (holding that "[t]he recommitment provisions of CPL 330.20(14) have a direct and substantial relationship with the State's interest in protecting the public safety, safeguarding the rights of insanity acquittees, and providing treatment to those acquittees who suffer from a mental illness") (emphasis added); cf.' Francis S., 221 F.3d at 112 (holding that the Court of Appeals correctly applied intermediate scrutiny when it upheld CPL § 330.20(14) using nearly identical language).
 
 
 55
 Whereas the Supreme Court in Jones found "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof," Jones, 463 U.S. at 367, 103 S.Ct. 3043 (emphasis added), those same differences arguably do not exist between insanity acquittees and civilly-committed persons subject to conditional release, who by definition have already been adjudged dangerously mentally ill and committed to a secure facility on that basis. In rejecting petitioner's equal protection argument, the Appellate Division seems not to have recognized the importance of this distinction—an oversight that is apparent from its characterization of NRRMDD defendants as "an exceptional class of individuals who may properly be treated somewhat differently from persons subject to civil commitment." In re Ernst J., 739 N.Y.S.2d at 738 (internal quotation marks omitted) (emphasis added). Here, petitioner does not contend that he is entitled to the same procedural safeguards as "persons subject to civil commitment"—i.e., persons who have not been accused of any crime but who nonetheless face the prospect of commitment on the basis of their dangerous mental disorder. Rather, petitioner insists that the state should not be permitted to recommit him to a secure facility without satisfying the same standard of proof applied in recommitment proceedings for persons who have already been civilly committed upon a finding by clear and convincing evidence that they suffer from a dangerous mental disorder.
 
 
 56
 Petitioner's equal protection claim is further strengthened by the Supreme Court's holdings in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), and Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972)—two cases that petitioner mysteriously does not cite. In Baxstrom, the Court held that a prisoner who was committed to a psychiatric facility at the expiration of his criminal sentence in a state prison[11] was denied equal protection of the laws when he was subjected to civil commitment under a special procedure applicable only to prisoners, rather than to the procedures used for civil commitment of other, similarly-situated persons. See Baxstrom, 383 U.S. at 110, 86 S.Ct. 760 (holding that petitioner "was denied equal protection of the laws by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York"). The Baxstrom Court held that "the State, having made this substantial review proceeding generally available on this issue may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some." Id. at 111, 86 S.Ct. 760.
 
 
 57
 In Jackson, a criminal defendant deemed incompetent to stand trial challenged the standards for his release from the custody of the state department of mental health. The Supreme Court held that the State of Indiana deprived a mentally-ill petitioner of equal protection of the laws by confining him to a mental institution subject to a more stringent standard of release than was applicable to civilly-committed persons. See Jackson, 406 U.S. at 727-30, 92 S.Ct. 1845. The Court noted that although "Baxstrom did not deal with the standard for release . . . its rationale is applicable [because] [t]he harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release." Id. at 729, 92 S.Ct. 1845.
 
 
 58
 While, on balance, we are not certain that New York's disparate treatment of "track three" NRRMDD defendants and civil patients who have been released subject to an order of conditions satisfies the intermediate scrutiny standard, we nonetheless recognize that a reasonable argument can be made to that effect. In Jones, the Supreme Court emphasized that because insanity acquittees have themselves acknowledged that they suffer from mental illness and because their mental illness caused them to engage in criminal conduct as opposed to mere antisocial or idiosyncratic behavior, states have a special interest in their extended supervision. In the absence of any direct guidance from the Supreme Court regarding whether its analysis in Jones extends to recommitment proceedings, one could argue that because civilly-committed persons do not share the above-mentioned traits, they are not similarly-situated to "track three" NRRMDD defendants and therefore may be subjected to lower standards of proof in recommitment proceedings.
 
 
 59
 In Francis S., we expressed our belief that an equal protection violation "might well" have been shown, but we concluded in light of the deferential standard of review prescribed by AEDPA that it was not "objectively unreasonable for the New York Court of Appeals to reject Francis's equal protection claim." Francis S., 221 F.3d at 113. In reaching this conclusion, we noted that while Baxstrom appeared to provide strong authority in support of petitioner's constitutional argument, it was "not decisive . . . since, unlike Francis, [Baxstrom] had never been adjudicated mentally ill based on his own plea; he was a prisoner whom prison authorities had administratively determined should be confined in a prison hospital." Id. (emphasis added). Because petitioner cannot be distinguished from Francis S. in any constitutionally-relevant sense, and because we remain subject to the constraints imposed by AEDPA,[12] we must deny petitioner's equal protection claim.
 
 
 60
 In holding that petitioner is not entitled to habeas relief, we do not endorse the constitutional analysis of the Appellate Division other than to say that it was not "objectively unreasonable," nor do we foreclose the possibility that other NRRMDD defendants who are subjected to New York's recommitment procedure may raise constitutional objections to that procedure or seek relief through other legal means.
 
 CONCLUSION
 
 61
 In sum, we hold that it was not objectively unreasonable for the Appellate Division to conclude, in light of clearly established federal law as enunciated by the Supreme Court of the United States, that a New York statute providing for the recommitment of "track three" NRRMDD defendants under a mere "preponderance of the evidence" standard does not violate either the Due Process or Equal Protection Clauses of the Fourteenth Amendment. Accordingly, we affirm the District Court's denial of petitioner's application for a writ of habeas corpus.
 
 
 
 Notes:
 
 
 [1]
 CPL § 330.20(14) provides, in relevant part, that [a]t any time during the period covered by an order of conditions an application may be made by the [state] commissioner [of mental health or mental retardation and developmental disability] or the district attorney to the court that issued such order ... for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder.... Upon receipt of such application the court must order the defendant to appear before it for a hearing to determine if the defendant has a dangerous mental disorder.... At such hearing, the applicant ... must establish to the satisfaction of the court that the defendant has a dangerous mental disorder.... If the court finds that the defendant has a dangerous mental disorder, it must issue a recommitment order
 
 
 [2]
 CPL § 220.15(4) provides, in relevant part, that [t]he court shall not accept a plea of [NRRMDD] without first determining that there is a factual basis for such a plea. The court must address the defendant personally in open court and determine that the plea is voluntary, knowingly made, and not the result of force, threats, or promises.... The court must be satisfied that the defendant understands the proceedings against him, has sufficient capacity to assist in his own defense and understands the consequences of a plea of [NRRMDD]
 
 
 [3]
 "`Dangerous mental disorder' means: (i) that a defendant currently suffers from a `mental illness' as that term is definition in [Mental Hygiene Law § 1.03(20)], and (ii) that because of such condition he currently constitutes a physical danger to himself or others." CPL § 330.20(1)(c)
 
 
 [4]
 "`Mentally ill' means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment...." CPL § 330.20(1)(d)
 By contrast, the mental hygiene law defines the phrase "mental illness" more broadly, as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation." N.Y. Mental Hyg. Law § 1.03(20).
 
 
 [5]
 "`Order of conditions' means an order directing a defendant to comply with [his] prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate.... An order of conditions... shall be valid for five years from the date of its issuance, except that, for good cause shown, the court may extend the period for an additional five years." CPL § 330.20(1)(o).
 
 
 [6]
 As the District Court noted, this "recommitment" procedure also applies to defendants who were never "committed" under the CPL after their initial hearingSee Ernst J., 372 F.Supp.2d at 333 n. 2 (citing People v. Stone, 73 N.Y.2d 296, 539 N.Y.S.2d 718, 536 N.E.2d 1137 (1989)).
 
 
 [7]
 CPL § 330.20(2) provides, in relevant part, that upon the acceptance of a plea of [NRRMDD], the court must immediately issue an examination order. Upon receipt of such order, the commissioner must designate two qualified psychiatric examiners to conduct the examination to examine the defendant
 
 
 [8]
 Kingsboro simultaneously petitioned the New York Supreme Court for an additional, civil order of retention pursuant to MHL § 9.33. Because the court granted the Commissioner's request for recommitment pursuant to CPL § 330.20(14), it did not rule on Kingsboro's civil retention application
 
 
 [9]
 InFrancis S., we treated the petitioner's constitutional challenge as a "combined equal protection and procedural due process claim," and deferred to the judgment of the New York Court of Appeals with regard to both arguments. See Francis S., 221 F.3d at 111-13.
 
 
 [10]
 Although the label "intermediate scrutiny" carries different connotations depending on the area of law in which it is used,see Jay D. Wexler, Defending the Middle Way: Intermediate Scrutiny as Judicial Minimalism, 66 Geo. Wash. L.Rev. 298, 315-21 (1998) (surveying the Supreme Court's application of "intermediate scrutiny" in different legal contexts), we use the term here to refer to the requirement that a law must serve important governmental objectives and must be substantially related to achievement of those objectives. See Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (developing an intermediate scrutiny standard for statutory classifications on the basis of sex).
 
 
 [11]
 Mr. Baxstrom "was convicted of second degree assault in April 1959 and was sentenced to a term of two and one-half to three years in a New York prison."Baxstrom, 383 U.S. at 108, 86 S.Ct. 760.
 
 
 [12]
 We reject the District Attorney's apparent misreading of our analysis inFrancis S. as a determination "that the New York Court of Appeals, in In re Francis S., 87 N.Y.2d 554, 562-64, 640 N.Y.S.2d 840, 843-45, 663 N.E.2d 881 (1995), had properly applied this `intermediate level of scrutiny' when rejecting Francis S.'s challenge to the application of C.P.L. § 330.20(14) recommitment procedure to `track two' defendants such as himself." Br. of Appellees at 33. In Francis S., we took care to emphasize that while we did not endorse the Court of Appeals' views on the constitutionality of CPL § 330.20(14), we were nonetheless obligated under AEDPA to defer to that court's analysis inasmuch as it was not "objectively unreasonable." See Francis S., 221 F.3d at 113.